## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMERICAN FREEDOM DEFENSE INITIATIVE; *et al.*,<br><br>Plaintiffs,<br><br>-v.-<br><br>SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY ("SEPTA"); *et al.*,<br><br>Defendants. | Case No. 2:14-cv-05335<br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>[Fed. R. Civ. P. 65] |

Plaintiffs American Freedom Defense Initiative (hereinafter referred to as "AFDI"), Pamela Geller, and Robert Spencer (collectively referred to as "Plaintiffs"), by and through their undersigned counsel, hereby move this court for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure against Defendants Southeastern Pennsylvania Transportation Authority ("SEPTA") and Joseph M. Casey, General Manager of SEPTA (hereinafter collectively referred to as "Defendants" or "SEPTA"), their employees, agents, and successors in office, enjoining SEPTA's restriction on Plaintiffs' speech and thus ordering the display of Plaintiffs' AFDI Advertisement on SEPTA's advertising space.

SEPTA's rejection of the AFDI Advertisement is an unlawful restraint on Plaintiffs' speech in violation of the First Amendment.

As set forth more fully in the accompanying brief and supporting declaration and exhibits, Plaintiffs have established that (1) they are likely to succeed on the merits of their First Amendment claim; (2) that they will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that granting the requested injunction is in the public interest.

On September 25, 2014, counsel for the parties conferred, and Defendants' counsel stated

that Defendants oppose this motion. Therefore, pursuant to Local Rule 7.1, this is a contested motion. Consequently, Plaintiffs request oral argument.

WHEREFORE, Plaintiffs respectfully request that the court grant this motion and immediately enjoin Defendants' restriction on Plaintiffs' speech and order the display of the AFDI Advertisement on SEPTA's advertising space.

Respectfully submitted,

**AMERICAN FREEDOM LAW CENTER**

/s/ *Robert J. Muise*
Robert Joseph Muise, Esq.* (MI P62849)
P.O. Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756; Fax: (801) 760-3901

/s/ *David Yerushalmi*
David Yerushalmi, Esq.* (DC # 978179)
1901 Pennsylvania Avenue NW, Suite 201
Washington, D.C. 20006
Tel: (646) 262-0500; Fax: (801) 760-3901

*Admitted *pro hac vice*

**DRINKER BIDDLE & REATH, LLP**

/s/ *Jason P. Gosselin*
Jason P. Gosselin
PA Bar ID 73682
Jason.gosselin@dbr.com
Brynne S. Madway
PA Bar ID 316422
Brynne.madway@dbr.com
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103-6996

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

AMERICAN FREEDOM DEFENSE
INITIATIVE; *et al*.,

       Plaintiffs,

    -v.-

SOUTHEASTERN PENNSYLVANIA
TRANSPORTATION AUTHORITY
("SEPTA"); *et al.*,

      Defendants.

Case No. 2:14-cv-05335

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS......................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ...............................................................................................................1

STATEMENT OF FACTS ..................................................................................................2

ARGUMENT ......................................................................................................................6

I.      Standard for Issuing a Preliminary Injunction ...................................................6

II.     Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Challenge to SEPTA's Prior Restraint on Their Speech.....................................................7

        A.     Plaintiffs' Advertisement Is Protected Speech ......................................8

        B.     SEPTA Created a Public Forum for Plaintiffs' Speech .........................9

        C.     SEPTA's Prior Restraint on Plaintiffs' Speech Cannot Survive Constitutional Scrutiny ...............................................................................................15

              1.     SEPTA's Speech Restriction Is Content Based.......................15

              2.     SEPTA's Speech Restriction Is Viewpoint Based....................16

              3.     SEPTA's Speech Restriction Is Unreasonable .........................20

              4.     SEPTA's Advertising Standards Permit Arbitrary, Capricious, and Subjective Application.............................................................22

III.    Plaintiffs Will Suffer Irreparable Harm in the Absence of Injunctive Relief ...................23

IV.    The Balance of Equities Tips Sharply in Favor of Granting the Injunction .....................23

V.     Granting the Injunction Is in the Public Interest................................................................24

CONCLUSION..................................................................................................................24

CERTIFICATE OF SERVICE .........................................................................................26

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Black Horse Pike Regional Bd. of Educ.*,
   84 F.3d 1471 (3d Cir. 1996) ................................................................................6

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
   880 F. Supp. 2d 456 (S.D.N.Y. 2012).................................................................7

*Ark. Educ. Television Comm'n v. Forbes*,
   523 U.S. 666 (1998)...........................................................................................11

*AT&T v. Winback & Conserve Program*,
   42 F.3d 1421 (3d Cir. 1994) ...............................................................................7

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963)...............................................................................................8

*Brandenburg v. Ohio*,
   395 U.S. 444 (1969)...........................................................................................19

*Brown v. Cal. Dep't of Transp.*,
   321 F.3d 1217 (9th Cir. 2003) ...........................................................................20

*Carey v. Brown*,
   447 U.S. 455 (1980).............................................................................................8

*Chaplinsky v. New Hampshire*,
   315 U.S. 568 (1942)...........................................................................................19

*Children of the Rosary v. City of Phoenix*,
   154 F.3d 972 (9th Cir. 1998) .............................................................................11

*Christ's Bride Ministries, Inc. v. Southeastern Pa. Transp. Auth.*,
   148 F.3d 242 (3d Cir. 1998)....................................................................... *passim*

*Cogswell v. City of Seattle*,
   347 F.3d 809 (9th Cir. 2003) .............................................................................17

*Cohen v. California*,
   403 U.S. 15 (1971)..............................................................................................18

*Connick v. Myers*,
   461 U.S. 138 (1983)..............................................................................................8

*Consol. Edison Co. of N.Y. v. Pub. Serv. Comm. of N.Y.,*
    447 U.S. 530 (1980) .................................................................................16

*Cooper v. Southeastern Pa. Transp. Auth.,*
    548 F.3d 296 (3d Cir. 2008) ......................................................................3

*Cornelius v. NAACP Legal Def. & Educ. Fund,*
    473 U.S. 788 (1985) ........................................................................ *passim*

*Dayton Area Visually Impaired Persons, Inc. v. Fisher,*
    70 F.3d 1474 (6th Cir. 1995) ...................................................................24

*Desert Outdoor Adver., Inc. v. City of Moreno Valley,*
    103 F.3d 814 (9th Cir. 1996) ...................................................................23

*DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.,*
    196 F.3d 958 (9th Cir. 1999) ...................................................................12

*Elrod v. Burns,*
    427 U.S. 347 (1976) .............................................................................1, 23

*Forsyth Cnty. v. Nationalist Movement,*
    505 U.S. 123 (1992) .................................................................................22

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n,*
    23 F.3d 1071 (6th Cir. 1994) ...............................................................1, 24

*Galena v. Leone,*
    638 F.3d 186 (3d Cir. 2011) ......................................................................9

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013) .................................................................24

*Grace Bible Fellowship, Inc. v. Maine Sch. Admin. Dist. No. 5,*
    941 F.2d 45 (1st Cir. 1991) ...............................................................10, 15

*Hague v. CIO,*
    307 U.S. 496 (1939) ...................................................................................9

*Hill v. Colorado,*
    530 U.S. 703 (2000) ...................................................................................8

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,*
    508 U.S. 384 (1993) .................................................................................16

*Lebron v. Wash. Metro. Area Transit Auth.*,
   749 F.2d 893 (D.C. Cir. 1984) .................................................................8

*Lehman v. City of Shaker Heights*,
   418 U.S. 298 (1974).............................................................................11, 12, 13

*NAACP v. City of Philadelphia*,
   No. 11-6533, 2014 U.S. Dist. LEXIS 105239, (E.D. Pa. Aug. 1, 2014) ..........18, 21

*NAACP v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982)..............................................................................8

*Newsom v. Norris*,
   888 F.2d 371 (6th Cir. 1989) ................................................................23

*N.Y. Magazine v. Metro. Transp. Auth.*,
   136 F.3d 123 (2d Cir. 1998).........................................................8, 12, 14

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964).............................................................................1, 13

*Nieto v. Flatau*,
   715 F. Supp. 2d 650 (E.D.N.C. 2010) ...................................................17

*Perry Educ. Ass'n v. Perry Local Educators*,
   460 U.S. 37 (1983).............................................................................9, 10, 16

*Pitt. League of Young Voters Educ. Fund. v. Port Auth. of Allegheny Cnty.*,
   653 F.3d 290 (3d Cir. 2011)...........................................................7, 9, 10, 16

*Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Auth.*,
   767 F.2d 1225 (7th Cir. 1985) ..............................................................12

*R.A.V. v. St. Paul*,
   505 U.S. 377 (1992)........................................................................15, 19, 20

*Ridley v. Mass. Bay Transp. Auth.*,
   390 F.3d 65 (1st Cir. 2004)..........................................................14, 17, 18, 20

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995)...........................................................................15, 16

*Sammartano v. First Judicial Dist. Court*,
   303 F.3d 959 (9th Cir. 2002) ...............................................................20, 24

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
    699 F.3d 1 (1st Cir. 2012)..................................................................................7

*S.O.C., Inc. v. Cnty. of Clark*,
    152 F.3d 1136 (9th Cir. 1998) .........................................................................15

*Southeastern Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975)........................................................................................22

*Swartzwelder v. McNeilly*,
    297 F.3d 228 (3d Cir. 2002) ...........................................................................23

*Turner Broad. Sys., Inc. v. F.C.C.*,
    512 U.S. 622 (1994)........................................................................................15

*United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*,
    163 F.3d 341 (6th Cir. 1998) ......................................................... *passim*

*United States v. Kokinda*,
    497 U.S. 720 (1990)........................................................................................21

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943)..........................................................................................1

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).............................................................................................6

**STATUTES**

42 U.S.C. § 1983...................................................................................................2

**RULES**

Fed. R. Civ. P. 65.................................................................................................1

**INTRODUCTION**

Government censorship is repugnant to our Constitution, and for good reason. Indeed, "[i]f there is any fixed star in our constitutional constellation, it is that <u>no</u> official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion. . . ." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (emphasis added). Permitting the government to restrict speech it deems uncivil and thus allowing it to take sides on important public issues directly undermines our "profound national commitment" to the freedom of speech. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Here, Defendants prohibited Plaintiffs from displaying an advertisement (hereinafter referred to as the "AFDI Advertisement") on SEPTA's advertising space based on Defendants' assertion that Plaintiffs' message "tends to disparage or ridicule any person or group of persons on the basis of race, religious belief, age, sex, alienage, national origin, sickness or disability" in violation of SEPTA's advertising standards ("Advertising Standards").

Defendants' speech restriction, facially and as applied to censor Plaintiffs' message, is a content- and viewpoint-based prior restraint on Plaintiffs' speech in violation of the First Amendment. Pursuant to clearly established jurisprudence, the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury sufficient to warrant the requested injunction. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Indeed, "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).

In sum, Plaintiffs satisfy the standard for issuing a preliminary injunction. *See* Fed. R. Civ. P. 65.

**STATEMENT OF FACTS**

Plaintiff AFDI is a nonprofit organization that is incorporated under the laws of the State of New Hampshire.  AFDI is dedicated to freedom of speech, freedom of conscience, freedom of religion, and individual rights.  (Geller Decl. ¶¶ 3, 4 at Ex. 1).

AFDI achieves its objectives through a variety of lawful means, including through the exercise of its right to freedom of speech under the U.S. Constitution.  (Geller Decl. ¶ 5 at Ex. 1).

AFDI exercises its right to freedom of speech and promotes its objectives by, *inter alia*, purchasing advertising space on transit authority property in major cities throughout the United States, including Philadelphia, Pennsylvania.  AFDI purchases these advertisements to express its message on current events and public issues, including issues such as Islam's hatred of Jews (hereinafter referred to as "AFDI's advertising campaign").  (Geller Decl. ¶ 6 at Ex. 1).

Plaintiff Pamela Geller is the president of AFDI, and she engages in protected speech through AFDI's activities, including AFDI's advertising campaign.  (Geller Decl. ¶¶ 1, 2, 7 at Ex. 1).

Plaintiff Robert Spencer is the vice president of AFDI, and he engages in protected speech through AFDI's activities, including AFDI's advertising campaign.  (Geller Decl. ¶¶ 2, 7 at Ex. 1).

SEPTA is an agency and instrumentality of the Commonwealth of Pennsylvania.[1]  It operates buses, subways, trolleys, and regional rail lines in and around the City of Philadelphia.  (Geller Decl. ¶ 8 at Ex. 1).

---

[1] As a governmental agency, SEPTA is mandated to comply with the First and Fourteenth Amendments to the Constitution and 42 U.S.C. § 1983.  *See Christ's Bride Ministries, Inc. v. Southeastern Pa. Transp. Auth.,* 148 F.3d 242, 247 (3d Cir. 1998) (concluding that SEPTA "is a state actor" and its "actions are constrained by the First and Fourteenth Amendments").  For purposes of claims arising under 42 U.S.C. § 1983, SEPTA is treated as a municipal agency

Defendant Joseph M. Casey was at all relevant times the General Manager of SEPTA. In that capacity, Defendant Casey is responsible for adopting, creating, and enforcing the policies and practices of SEPTA, including SEPTA's Advertising Standards. Defendant Casey was the final decision maker responsible for rejecting the AFDI Advertisement. (Geller Decl. ¶¶ 9, 24 at Ex. 1).

SEPTA, through its advertising agent, Titan Outdoor LLC (a/k/a Titan360 and Titan) (hereinafter "Titan"), leases space on its vehicles and transportation stations for use as advertising space. (Geller Decl. ¶ 10 at Ex. 1).

SEPTA accepts commercial and noncommercial public-service, public-issue, political-issue, and religious-issue advertisements, including controversial advertisements addressing these issues, for display on its advertising space. (Geller Decl. ¶¶ 11-14 at Ex. 1).

Accordingly, SEPTA permits, as a matter of policy and practice, a wide variety of commercial, noncommercial, public-service, public-issue, political-issue, and religious-issue advertisements on its advertising space. (Geller Decl. ¶¶ 11-14 at Ex. 1).

For example, SEPTA has displayed on its buses the following advertisement conveying a message and viewpoint on a religious issue:



(Geller Decl. ¶ 12 at Ex. 1).

---

when determining its liability. *Cooper v. Southeastern Pa. Transp. Auth.,* 548 F.3d 296, 311 (3d Cir. 2008) (concluding that "SEPTA is not entitled to Eleventh Amendment immunity").

As another example, in 2013, SEPTA displayed a controversial political advertisement seeking to end teacher seniority in Philadelphia's troubled public school system. The advertisement, which appears below, was the product of the Commonwealth Foundation for Public Policy Alternatives, a self-proclaimed "free-market think tank" that "crafts free-market policies, convinces Pennsylvanians of their benefits, and counters attacks on liberty." *See* http://www.commonwealthfoundation.org/about/.



(Geller Decl. ¶¶ 13, 14, Ex. A, at Ex. 1).

On or about May 27, 2014, Plaintiffs submitted the AFDI Advertisement to Mr. Scott E. Goldsmith, EVP & Chief Commercial Officer for Titan, for display on SEPTA's advertising space. Shortly after receiving the request, Mr. Goldsmith confirmed with Plaintiff Geller that the advertisement was "being reviewed by SEPTA." (Geller Decl. ¶ 15, Ex. B, at Ex. 1).

The AFDI Advertisement states, in relevant part, the following: "Islamic Jew-Hatred: It's in the Quran. Two Thirds of All US Aid Goes to Islamic Countries. Stop the Hate. End All Aid to Islamic Countries." (Geller Decl. ¶ 16 at Ex. 1).

The AFDI Advertisement appears as follows:



(Geller Decl. ¶¶ 17, 18, Ex. C, at Ex. 1).

The message of the AFDI Advertisement is timely in light of the fact that many Jews (and Christians) are being persecuted in Islamic countries in the Middle East, and many of these countries receive aid from the United States. Moreover, the Israel / Palestinian conflict has drawn intense international media attention as Hamas uses human shields (mostly women and children) to protect its rockets from Israel's defense forces while the Islamic terrorist organization initiates missile strikes and deadly terrorist attacks against Jews in Israel. (Geller Decl. ¶ 19 at Ex. 1).

This very same advertisement (AFDI Advertisement) recently ran on public transit authority advertising space in Washington, D.C., and it is currently running in New York City, without incident in either location. (Geller Decl. ¶ 20 at Ex. 1).

On June 3, 2014, Defendants officially rejected the AFDI Advertisement. In an email from Mr. Goldsmith to Plaintiff Geller, he states:

"Pamela: The following is the official response from SEPTA in regard to your proposed advertisement:

1.      SEPTA has reviewed your proposed ad and has determined that it does not comply with the advertising standards in Titan's agreement with SEPTA;

2.    The ad does not comply with Section 9(b)(xi) which prohibits 'Advertising that tends to disparage or ridicule any person or group of persons on the basis of race, religious belief, age, sex, alienage, national origin, sickness or disability.'

3.    SEPTA and Titan would be happy to review another proposed advertisement or discuss the reasons for the denial." (Geller Decl. ¶ 21, Ex. D, at Ex. 1).

On or about June 30, 2014, Plaintiffs' counsel, Mr. David Yerushalmi, requested from Mr. Goldsmith via email "the full text of SEPTA's advertising standards as set forth in Titan's agreement with SEPTA and any other advertising policies/procedures of SEPTA that may or may not be part of SEPTA-Titan agreement but that which are applicable when reviewing a proposed ad such as [the AFDI Advertisement]." (Geller Decl. ¶ 22, Ex. E, at Ex. 1).

On or about July 7, 2014, Mr. Goldsmith responded via email to Mr. Yerushalmi's request, stating, in relevant part, "Attached please find Section 9 of Titan's contract with SEPTA. It details the advertising standards/prohibitions for SEPTA." Attached to this email was a copy of SEPTA's Advertising Standards. (Geller Decl. ¶ 23, Exs. F & G, at Ex. 1).

Defendants' rejection of the AFDI Advertisement has caused and will continue to cause irreparable harm to Plaintiffs. (Geller Decl. ¶ 25 at Ex. 1).

## ARGUMENT

### I.    Standard for Issuing a Preliminary Injunction.

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also ACLU v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471, 1477 n.2 (3d Cir. 1996) (en

banc) (describing the four factors that govern a district court's decision whether to grant a preliminary injunction as follows: "(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest"). Plaintiffs satisfy each factor.

Additionally, because the requested injunction seeks to protect Plaintiffs' First Amendment right to freedom of speech, the crucial and often dispositive factor is whether Plaintiffs are likely to prevail on the merits. *See, e.g., Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) ("In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis."); *see generally AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994) ("As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff.").

## II.    Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Challenge to SEPTA's Prior Restraint on Their Speech.

Plaintiffs' First Amendment claim is reviewed in essentially three steps. First, the court must determine whether the speech in question—Plaintiffs' advertisement—is protected speech. Second, the court must conduct a forum analysis as to the forum in question to determine the proper constitutional standard to apply. And third, the court must then determine whether SEPTA's speech restriction comports with the applicable standard. *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 880 F. Supp. 2d 456, 466 (S.D.N.Y. 2012) (analyzing a free speech claim in "three parts"); *see also Christ's Bride Ministries, Inc. v. Southeastern Pa. Transp. Auth.,* 148 F.3d 242 (3d Cir. 1998) (conducting a forum analysis and applying the applicable constitutional standard in a case involving SEPTA's removal of an advertisement); *Pitt. League*

*of Young Voters Educ. Fund. v. Port Auth. of Allegheny Cnty.*, 653 F.3d 290 (3d Cir. 2011) (conducting a forum analysis and applying the applicable constitutional standard in a case challenging the port authority's rejection of an advertisement).

Moreover, SEPTA's "refusal to accept [Plaintiffs' advertisement] for display because of [its] content is a clearcut *prior restraint*." *Lebron v. Wash. Metro. Area Transit Auth.*, 749 F.2d 893, 896 (D.C. Cir. 1984) (Bork, J.) (emphasis added).  And "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (collecting cases); *see Lebron*, 749 F.2d at 896 (stating that the transit authority "carries a heavy burden of showing justification for the imposition of [a prior] restraint") (internal quotations and citation omitted).

## A.     Plaintiffs' Advertisement Is Protected Speech.

The first question is easily answered.  Plaintiffs' "posters come within the ambit of speech fully protected by the First Amendment." *Christ's Bride Ministries, Inc.,* 148 F.3d at 247; *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341 (6th Cir. 1998) (hereinafter "*United Food*") (holding that bus advertisements were protected speech); *N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 130 (2d Cir. 1998) (same); *see also Hill v. Colorado*, 530 U.S. 703, 714-15 (2000) ("[S]ign displays . . . are protected by the First Amendment.").

Moreover, "speech on public issues," such as Plaintiffs' timely advertisement addressing Islamic hatred of Jews, "occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982); *Carey v. Brown*, 447 U.S. 455, 467 (1980)).

Thus, there is no dispute that Plaintiffs' advertisement constitutes speech that is protected by the First Amendment.

**B.      SEPTA Created a Public Forum for Plaintiffs' Speech.**

"The [Supreme] Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for [expressive] purposes."  *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985).  Forum analysis has traditionally divided government property into three categories: traditional public forums, designated public forums, and nonpublic forums.[2]  *Id.*; *Pitt. League of Young Voters Educ. Fund.*, 653 F.3d at 295 ("There are three types of fora.").  Once the forum is identified, the court must then determine whether the speech restriction is justified by the requisite standard.  *Cornelius,* 473 U.S. at 800.

On one end of the spectrum lies the traditional public forum.  Traditional public forums, such as streets, sidewalks, and parks, are places that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."  *Hague v. CIO*, 307 U.S. 496, 515 (1939).  This forum is not at issue.

Next on the spectrum is the designated public forum, which exists when the government intentionally opens its property for expressive activity.  *Perry Educ. Ass'n v. Perry Local Educators*, 460 U.S. 37, 44 (1983).  As the Supreme Court stated, "[A] public forum may be

---

[2] The courts have also recognized a fourth category that is often described as a "limited public forum."  The Third Circuit has previously considered a limited public forum to be a subset of a designated public forum, but it has recently acknowledged the possibility that this view may have been superseded by Supreme Court case law.  *See Galena v. Leone*, 638 F.3d 186, 197-98 nn.8 & 9 (3d Cir. 2011) ("There appears to be some inconsistency in federal courts' opinions, even those of the Supreme Court, as to whether a limited public forum is a separate category or a subset of a designated public forum with a third category of forums being 'nonpublic forums.'  Recently the Court has used the term 'limited public forum' interchangeably with 'nonpublic forum,' thus suggesting that these categories of for[a] are the same.  Because the continued existence *vel non* of a 'nonpublic forum' category has no bearing in this case, we need not dwell on the possible distinction between limited public forums and nonpublic forums. . . .  We have stated that 'we have generally applied to limited public fora the constitutional requirements applicable to designated public fora.'  In light of *Pleasant Grove,* this statement may no longer be good law." (citations omitted)).

created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius*, 473 U.S. at 802.

In a traditional or designated public forum, restrictions on speech are subject to strict scrutiny. *Id.* at 800. Thus, "speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. . . . Similarly, when the government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling government interest." *Id.*

At the opposite end of the spectrum is the nonpublic forum. The nonpublic forum is "[p]ublic property which is not by tradition or designation a forum for public communication." *Perry Educ. Ass'n,* 460 U.S. at 46. In a nonpublic forum, the government "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* Thus, even in a nonpublic forum, a speech restriction must be reasonable and viewpoint neutral to pass constitutional muster. *Id.*; *see also Pitt. League of Young Voters Educ. Fund.*, 653 F.3d at 296 ("Access to a nonpublic forum can be restricted so long as the restrictions are reasonable and viewpoint neutral.").

To resolve the forum question, courts "look[] to the policy and practice of the government" as well as "the nature of the property and its compatibility with expressive activity." *Cornelius*, 473 U.S. at 802. When conducting this analysis, "actual practice speaks louder than words." *Grace Bible Fellowship, Inc. v. Maine Sch. Admin. Dist. No. 5,* 941 F.2d 45, 47 (1st Cir. 1991).

Thus, a forum analysis "involve[s] a careful scrutiny of whether the government-imposed restriction on access to public property is truly part of the process of limiting a nonpublic forum

to activities compatible with the intended purpose of the property." *United Food,* 163 F.3d at 351-52 (internal quotations and citation omitted). Indeed, in *Christ's Bride Ministries, Inc. v. Southeastern Pennsylvania Transportation Authority,* 148 F.3d 242, 252-53 (3d Cir. 1998), the Third Circuit held that SEPTA's "advertising space" was a designated public forum, noting that "the purpose of the forum does not suggest that it is closed, and the breadth of permitted speech points in the opposite direction." As demonstrated below, this conclusion must be sustained here.

We turn now to the relevant case law regarding the forum question, starting with *Lehman v. City of Shaker Heights,* 418 U.S. 298 (1974).[3] In *Lehman*, the Court found that the consistently enforced, twenty-six-year ban on political advertising was consistent with the government's role as a proprietor precisely because the government "limit[ed] car card space to innocuous and less controversial commercial and service oriented advertising." *Id*. at 304 (emphasis added).

Other circuit courts have followed the holding in *Lehman* to conclude that transportation advertising space was a nonpublic forum when the government "consistently promulgates and enforces policies restricting advertising on its buses *to commercial advertising*." *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 978 (9th Cir. 1998) (emphasis added).

_____

[3] *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666 (1998) (hereinafter "*AETC*"), is instructive. In *AETC*, the petitioner, a state-owned public television broadcaster, denied the request of respondent Forbes, an independent candidate with very little support, for permission to participate in a sponsored debate between major party candidates. The Court upheld the exclusion, finding that it was reasonable and viewpoint-neutral in that it was based on Forbes' *status* as a speaker (*i.e*., he was not a serious candidate) and not the *message* he sought to convey. *Id*. at 682 (finding no "objections or opposition to his views"). Here, there is no question that Plaintiffs, as paid advertisers, are part of the class of speakers for which SEPTA's advertising space is open and available. And there is little doubt that had Forbes' status as a speaker made him eligible for the debate (*i.e*., he was a serious candidate) but that he had been denied permission to participate because he held the view that the United States should not fund Islamic countries that engage in Jew hatred (an important public issue), the Court would have found a First Amendment violation. And so should the court here.

As the Ninth Circuit observed in *DiLoreto v. Downey Unified School District Board of Education*:

> Government policies and practices that historically have allowed commercial advertising, but have excluded political and religious expression, indicate an intent not to designate a public forum for all expressive activity, but to reserve it for commercial speech. . . . However, where the government historically has accepted a wide variety of advertising on commercial and non-commercial subjects, courts have found that advertising programs on public property were public fora.

*DiLoreto,* 196 F.3d at 965 (citing, *inter alia*, *Lehman*, 418 U.S. at 303-04).

Similarly, the Second Circuit has held that "[d]isallowing political speech, and allowing commercial speech only, indicates that making money is the main goal. Allowing political speech, conversely, evidences a general intent to open a space for discourse, and a deliberate acceptance of the possibility of *clashes of opinion and controversy* that the Court in *Lehman* recognized as *inconsistent with sound commercial practice*." *N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 130 (2d Cir. 1998) (emphasis added); *see also Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Auth.*, 767 F.2d 1225 (7th Cir. 1985) (concluding that the advertising space on a bus system became a public forum where the transit authority permitted "a wide variety" of commercial and non-commercial advertising).

And the Sixth Circuit correctly observed in *United Food* the following:

> In accepting a wide array of political and public-issue speech, [the government] has demonstrated its intent to designate its advertising space a public forum. Acceptance of a wide array of advertisements, including political and public-issue advertisements, is indicative of the government's intent to create an open forum. Acceptance of political and public-issue advertisements, *which by their very nature generate conflict*, *signals a willingness on the part of the government to open the property to controversial speech*, which the Court in *Lehman* recognized as *inconsistent with operating the property solely as a commercial venture*.

163 F.3d at 355 (emphasis added).

Consequently, consistent with *Lehman* and the majority of circuit courts that have analyzed and followed its holding, the forum at issue here is a designated public forum for

Plaintiffs' speech. As the evidence demonstrates, SEPTA does not limit its advertisements "to innocuous and less controversial commercial and service oriented advertising." Rather, SEPTA accepts religious messages ("Judgment Day . . . Cry mightily unto God") and messages addressing controversial political issues such as teacher seniority—"which by their very nature generate conflict"—thereby "signal[ing] a willingness on the part of the government to open the property to controversial speech, which the Court in *Lehman* recognized as inconsistent with operating the property solely as a commercial venture." *See United Food*, 163 F.3d at 355.

Moreover, a forum analysis does not end simply because SEPTA has adopted some restrictions on speech or employed these restrictions to reject certain advertisements. And this is particularly the case when the government is attempting to impose a viewpoint-based "civility" or "disparagement" restriction[4] on what it knows is public-issue speech—a fool's errand under the First Amendment. *See, e.g., N.Y. Times Co.*, 376 U.S. at 271 ("[First Amendment] protection does not turn upon the truth, popularity, or social utility of the ideas and beliefs which are offered.") (internal quotations and citation omitted).

Indeed, it is patently incorrect to conclude that SEPTA's "civility" restriction is a restriction on an advertisement's subject matter (such as a restriction on advertisements for alcohol, tobacco, or political candidates) that might reasonably lead a court to conclude that this forum is closed to controversial matters and thus limited to less controversial and innocuous commercial advertisements such that the government's intent to operate as a proprietor and not a speech regulator is clear. Rather, as argued further below, the "civility" restriction is ambiguous, arbitrary, subjective, and viewpoint based. Consequently, this restriction does not justify concluding that the forum at issue is a nonpublic forum. Rather, it compels the conclusion that regardless of the forum, the restriction violates the Constitution. (*See infra* sec. II.C. [discussing

---

[4] As noted, SEPTA rejected Plaintiffs' advertisement on the grounds that it "tends to disparage or ridicule any person or group of persons on the basis of race, religious belief, age, sex, alienage, national origin, sickness or disability." (Geller Decl. ¶¶ 21, 23, Exs. D & G, at Ex. 1).

the constitutionality of the speech restriction under the First Amendment]).  At a minimum, SEPTA's subjective criteria certainly *allow for* viewpoint-based restrictions, and this alone is sufficient to render its advertising policy facially unconstitutional.  *See United Food*, 163 F.3d at 359 (holding that a speech restriction violates the First Amendment when it permits government officials to limit speech based on "ambiguous and subjective reasons") (citation and internal quotation omitted).

Moreover, "it cannot be true that if the government excludes any category of speech from a forum through a rule or standard, that forum becomes *ipso facto* a non-public forum, such that we would examine the exclusion of the category only for reasonableness.  This reasoning would allow every designated public forum to be converted into a non-public forum the moment the government did what is supposed to be impermissible in a designated public forum, which is to exclude speech based on content."  *N.Y. Magazine*, 136 F.3d 129-30; *see also Christ's Bride Ministries*, *Inc.*, 148 F.3d at 249 ("Restrictions on the use of the forum, however, do not necessarily mean that SEPTA has not created a public forum.").

In the final analysis, it is without question that the nature of the property—the advertising space on SEPTA's buses—is compatible with Plaintiffs' proposed expressive activity.  *See Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 76-77 (1st Cir. 2004) ("As to the nature of the property, the MBTA does run advertisements and so there is nothing inherent in the property which precludes its use for <u>some</u> expressive activity."); *United Food*, 163 F.3d at 355 (concluding that the advertising space on a bus system was a public forum and stating that "acceptance of political and public-issue speech suggests that the forum is suitable for the speech at issue"—a pro-union message).  And it is without question that SEPTA does not limit its advertising space to innocuous commercial messages but rather permits advertisements expressing messages on controversial political subject matter.  Thus, it is without question that SEPTA is willing to accept *some* political viewpoints that generate conflict, such as those

involving the issue of teacher seniority in Philadelphia's failing public schools—actions which speak louder than any written policy.  *See Grace Bible Fellowship, Inc.,* 941 F.2d at 47.

In sum, because the forum is wholly suitable for Plaintiffs' speech, *Christ's Bride Ministries, Inc.,* 148 F.3d at 252 (concluding that the transit authority had "created a forum that is suitable for the speech in question"), it is a designated public forum for the display of Plaintiffs' advertisement.  Therefore, SEPTA must demonstrate a *compelling* reason that is *narrowly tailored* to justify its prior restraint on Plaintiffs' speech—a burden that it cannot meet.

### C.    SEPTA's Prior Restraint on Plaintiffs' Speech Cannot Survive Constitutional Scrutiny.

#### 1.    SEPTA's Speech Restriction Is Content Based.

Content-based restrictions on speech in a public forum are subject to strict scrutiny. *Cornelius*, 473 U.S. at 800.  That is, "[s]peakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest."  *Id.*  For "[i]t is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."  *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 828 (1995); *see also R.A.V. v. St. Paul*, 505 U.S. 377, 386-92 (1992) (holding that the government may not "impose special prohibitions on those speakers who express views on disfavored subjects" or on the basis of "hostility—or favoritism—towards the underlying message expressed").  Consequently, courts "apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content."  *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994).  Thus, content-based restrictions "are presumptively unconstitutional."  *S.O.C., Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1145 (9th Cir. 1998).

To determine whether a restriction is content based, the court looks at whether it "restrict(s) expression because of its message, its ideas, its subject matter, or its content." *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm. of N.Y.*, 447 U.S. 530, 537 (1980). Here, it is undisputed that SEPTA rejected Plaintiffs' advertisement based on the content (and viewpoint) of the advertisement's message in clear violation of the First Amendment.

Indeed, as noted previously and discussed further below, SEPTA's Advertising Standards, facially and as applied to restrict Plaintiffs' speech, cannot survive constitutional scrutiny regardless of the nature of the forum because they are viewpoint based and unreasonable, and they grant government officials unbridled and subjective discretion over the forum's use.[5]

### 2. SEPTA's Speech Restriction Is Viewpoint Based.

Viewpoint discrimination is an egregious form of content discrimination that is prohibited in all forums. *See Rosenberger*, 515 U.S. at 829. *Pitt. League of Young Voters Educ. Fund.*, 653 F.3d at 296 ("Regardless of whether the advertising space is a public or nonpublic forum, the coalition is entitled to relief because it has established viewpoint discrimination."). "The principle that has emerged from [Supreme Court] cases is that the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (internal quotations and citation omitted). "When the government targets *not subject matter*, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829 (emphasis added).

---

[5] As noted previously, even in a nonpublic forum, a government speech regulation must be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n*, 460 U.S. at 46. As demonstrated further in the text that follows, SEPTA's restriction on Plaintiffs' speech fails this test as well.

Consequently, when speech "fall[s] within an acceptable subject matter otherwise included in the forum, the State may not legitimately exclude it from the forum based on the viewpoint of the speaker." *Cogswell v. City of Seattle*, 347 F.3d 809, 815 (9th Cir. 2003). Thus, viewpoint discrimination occurs when the government "denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Cornelius*, 473 U.S. at 806.

Here, there was nothing objectionable *per se* about the subject matter of Plaintiffs' message (*i.e.*, the conflict between Islam and Judaism, which is referenced in the Quran).[6] Consider, for example, a proposed advertisement that said "Islamic love of Jews . . . It's in the Quran." There is little doubt that this advertisement would be accepted. Consequently, it is not the subject matter that is being restricted, but Plaintiffs' viewpoint on the subject. This is a classic form of viewpoint discrimination that is prohibited in <u>all</u> forums. *See Cornelius*, 473 U.S. at 806; *see also Nieto v. Flatau*, 715 F. Supp. 2d 650 (E.D.N.C. 2010) (holding that a speech restriction on a military base, a nonpublic forum, was viewpoint based as applied to speech that the government deemed disparaging toward Islam in violation of the First Amendment).

Moreover, it is not acceptable to claim that SEPTA's restriction on Plaintiffs' speech was viewpoint neutral by arguing, for example, that Plaintiffs could run the advertisement if they "toned it down" or removed the picture of Hitler. This issue was addressed in *Ridley v. Massachusetts Bay Transportation Authority*, 390 F.3d 65 (1st Cir. 2004), and the First Circuit held that the transit authority's restriction on certain advertisements that were critical of laws prohibiting drug use were viewpoint based in violation of the First Amendment. The MBTA

---

[6] *See, e.g.,* Quran 5:51 ("O you who believe! do not take the Jews and the Christians for friends; they are friends of each other; and whoever amongst you takes them for a friend, then surely he is one of them; surely Allah does not guide the unjust people.").

attempted to avoid the fact that its restriction was viewpoint based by arguing that a similar message could run if a different manner of expression was used. The court rejected the argument, stating,

> MBTA's concession means simply that it will run advertisements which do not attract attention but will exercise its veto power over advertisements which are designed to be effective in delivering a message. Viewpoint discrimination concerns arise when the government intentionally tilts the playing field for speech; _reducing the effectiveness of a message, as opposed to repressing it entirely, thus may be an alternative form of viewpoint discrimination_.

*Id.* at 88 (emphasis added); *see also Cohen v. California*, 403 U.S. 15, 26 (1971) ("[W]e cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views."). Thus, attempting to reduce the effectiveness of a message by changing the thrust of its meaning, even if the entire message itself is not prohibited, by way of a "civility" standard is a form of viewpoint discrimination that is impermissible in every forum. *See, e.g., Ridley*, 390 F.3d at 82 ("The bedrock principle of viewpoint neutrality demands that the state not suppress speech where the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses.").

In *NAACP v. City of Philadelphia*, No. 11-6533, 2014 U.S. Dist. LEXIS 105239, (E.D. Pa. Aug. 1, 2014), for example, this court held that the Philadelphia International Airport's "unwritten policy" of rejecting advertisements that do not give visitors to Philadelphia "a positive image" of the region was viewpoint based in violation of the First Amendment. In reaching this conclusion, the court made the following observation that is relevant here:

> This is viewpoint discrimination. Of course, the City and the Airport may advocate for Philadelphia, exercising full-throatedly their right to government speech. But _they cannot create a forum for private speech and then exclude speakers they do not agree_

*with*.  The City allows non-government actors to speak in the Airport so long as they toe the government's line.  By stifling speech that the City dislikes, the City risks creating an environment where nongovernment speakers whistle in unison a happy, secretly government sanctioned tune.  The First Amendment furthers our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," even when speech "include[s] vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."  The City's unwritten advertising policy falls far short of that lofty goal.

*Id.* at *59-60 (emphasis added).  Similarly here, SEPTA's viewpoint-based, prior restraint on Plaintiffs' speech "falls far short" of the "lofty goal[s]" afforded private citizens by the First Amendment.

Finally, the conclusion that SEPTA's speech restriction is viewpoint based is further compelled by *R.A.V. v. St. Paul*, 505 U.S. 377 (1992).  In *R.A.V.*, the Court was asked to review the constitutionality of an ordinance that prohibited "conduct that amounts to 'fighting words' *i.e.*, 'conduct that itself inflicts injury or tends to incite immediate violence. . . ,'" so as to protect "the community against bias-motivated threats to public safety and order."  *Id.* at 380-81.  Even though "fighting words" are proscribable under the First Amendment, *see Chaplinsky v. New Hampshire,* 315 U.S. 568, 572 (1942), similar to speech that "incite[s] an imminent act" of lawless action, *see Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969), the Court struck down the ordinance because it only applied to prohibit such conduct "on the basis of race, color, creed, religion or gender."  *R.A.V.,* 505 U.S. at 391.  Relevant here is the Court's following conclusion:

In its practical operation, moreover, the ordinance goes even beyond mere content discrimination, to actual viewpoint discrimination.  Displays containing some words—odious racial epithets, for example—would be prohibited to proponents of all views.  But "fighting words" that do not themselves invoke race, color, creed, religion, or gender—aspersions upon a person's mother, for example—would seemingly be usable *ad libitum* in the placards of those arguing *in favor* of racial, color, etc., tolerance and equality, but could not be used by those speakers' opponents.  One could hold up a sign saying, for example, that all "anti-Catholic bigots" are misbegotten; but not that all "papists" are, for that would insult and provoke violence "on the basis of religion."  St. Paul has no such authority to

license one side of a debate to fight freestyle, while requiring the other to follow
Marquis of Queensberry rules.

*Id*. at 391-92; *see also Ridley*, 390 F.3d 65-66 (noting "that the 2003 revision to the guidelines

continued to prohibit demeaning or disparaging ads, but did so in more general terms, not tied

only to certain categories such as race, religion, and gender," and further noting that this revision

was "[m]ost likely . . . in light of *R.A.V.* . . . and later case law").

In sum, the advertising standard employed by SEPTA to restrict Plaintiffs' speech is

viewpoint based on its face and in its application, and thus violates the First Amendment

regardless of the nature of the forum.

### 3. SEPTA's Speech Restriction Is Unreasonable.

Reasonableness is evaluated "in light of the purpose of the forum and *all the surrounding*

*circumstances*." *Cornelius*, 473 U.S. at 809 (emphasis added); *see also Brown v. Cal. Dep't of*

*Transp.*, 321 F.3d 1217, 1222-23 (9th Cir. 2003) (preliminarily enjoining the enforcement of the

California Department of Transportation's policy of permitting the display of American flags,

but prohibiting the display of all other banners and signs on highway overpass fences, a

nonpublic forum, concluding, *inter alia*, that the "proffered justification" for the restriction was

"patently unreasonable"). And the "reasonableness" requirement for speech restrictions

"requires more of a showing than does the traditional rational basis test; *i.e.*, it is not the same as

establishing that the regulation is rationally related to a legitimate government objective, as

might be the case for the typical exercise of the government's police power. There must be

evidence in the record to support a determination that the restriction *is* reasonable. That is, there

must be evidence *that the restriction reasonably fulfils a legitimate need*." *Sammartano v. First*

*Judicial Dist. Court*, 303 F.3d 959, 966-67 (9th Cir. 2002) (internal quotations and citations

omitted).

As the Third Circuit observed:

> Consideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved.

*Christ's Bride Ministries, Inc*., 148 F.3d at 255 (quoting *United States v. Kokinda*, 497 U.S. 720, 732 (1990)).  Thus, "the reasonableness of the government's restriction on speech depends on the nature and purpose of the property for which it is barred."  *Christ's Bride Ministries, Inc*., 148 F.3d at 255.  For example, rules limiting disruptive behavior in a library are reasonable given the nature and purpose of a library.  *See id*.

In light of this relevant case law, in *Christ's Bride Ministries, Inc.*, the Third Circuit concluded "that SEPTA's removal of the [anti-abortion] posters violated the First Amendment because the removal was not 'reasonable.'"  *Id*.  Indeed, despite the very controversial nature of the abortion issue, the court concluded that "[t]he subject of the speech, and the manner in which it was presented, were compatible with the purposes of the forum," noting that "the government has offered no basis on which to conclude that the speech in question would interfere with the accepted purposes of the advertising space."  *Id*. at 256.

Moreover, in *NAACP v. City of Philadelphia*, No. 11-6533, 2014 U.S. Dist. LEXIS 105239, (E.D. Pa. Aug. 1, 2014), this court held that the prohibition on non-commercial advertisements at the Philadelphia International Airport—a nonpublic forum—was also "unreasonable" in violation of the First Amendment in that displaying such ads was "perfectly compatible" with the forum, would not "diminish advertising revenue" or the airport's "efficacy," nor make the airport "a meaningfully less positive, family oriented place."  *Id*. at *43-47.  At issue in *NAACP* was an advertisement titled, "Misplaced Priorities," which showed the Statue of Liberty silhouetted against a sunset to the right of text stating, "Welcome to America,

home to 5% of the world's people & 25% of the world's prisoners," and below that smaller type text, stating, "Let's build a better American together. NAACP.org/smartandsafe." *Id*. at *1-2.

In this case, similar to the situation in *Christ's Bride Ministries, Inc.*, SEPTA does not prohibit non-commercial advertisements, thus acknowledging that the display of public issue advertisements—advertisements which by their nature generate controversy—is "perfectly compatible" with the forum. SEPTA also accepts the type of advertisements at issue here (*i.e.*, advertisements for display on its buses). Therefore, the *manner* in which the speech is presented is also compatible with the purpose of the forum. And finally, Plaintiffs will pay the required fees to run the AFDI Advertisement. Therefore, displaying Plaintiffs' advertisement will promote SEPTA's purpose of raising revenue through advertisements. In short, regardless of the nature of the forum, the restriction on Plaintiffs' advertisement is simply unreasonable in violation of the First Amendment.

### 4. SEPTA's Advertising Standards Permit Arbitrary, Capricious, and Subjective Application.

As noted by the Supreme Court, "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553 (1975).

As the Sixth Circuit held in a case involving the government's regulation of bus advertising: "The absence of clear standards guiding the discretion of the public official vested with the authority to enforce the enactment invites abuse by enabling the official to administer the policy on the basis of impermissible factors." *United Food*, 163 F.3d at 359; *see also Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) ("A government regulation that allows arbitrary application . . . has the potential for becoming a means of suppressing a particular point of view.").

Consequently, a speech restriction "offends the First Amendment when it grants a public official 'unbridled discretion' such that the official's decision to limit speech is not constrained by *objective criteria*, but may rest on 'ambiguous and subjective reasons.'" *United Food*, 163 F.3d at 359 (quoting *Desert Outdoor Adver., Inc. v. City of Moreno Valley,* 103 F.3d 814, 818 (9th Cir. 1996)) (emphasis added).

Here, SEPTA's only proffered justification for restricting Plaintiffs' speech under its Advertising Standards is that the rejected advertisement allegedly "tends to disparage or ridicule any person or group of persons on the basis of race, religious belief, age, sex, alienage, national origin, sickness or disability." However, the application of this standard is entirely subjective. Indeed, there are no "objective criteria" for determining whether any particular advertisement "tends to disparage or ridicule." Moreover, as demonstrated above, this endeavor is inherently viewpoint based and entirely unreasonable.

## III. Plaintiffs Will Suffer Irreparable Harm in the Absence of Injunctive Relief.

The proof of irreparable harm suffered by Plaintiffs is clear and convincing. It is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Swartzwelder v. McNeilly*, 297 F.3d 228, 241(3d Cir. 2002) (same); *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.") (citing *Elrod*).

## IV. The Balance of Equities Tips Sharply in Favor of Granting the Injunction.

The likelihood of harm to Plaintiffs without the injunction is substantial because the deprivation of First Amendment rights, even for minimal periods, constitutes irreparable injury.

(*See supra* sec. III).  On the other hand, if SEPTA is enjoined from enforcing its prior restraint on Plaintiffs' speech, it will suffer no harm because the exercise of constitutionally protected rights can never harm any of SEPTA's legitimate interests.  Moreover, the fact that the AFDI Advertisement has run without incident on public transit authority advertising space in other major cities (New York and Washington, D.C.) demonstrates that any concerns of disruption by SEPTA are unfounded.

**V.      Granting the Injunction Is in the Public Interest.**

Courts considering requests for preliminary injunctions have consistently recognized that the public interest is best served by upholding First Amendment freedoms.  *See Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995) (stating that "the public as a whole has a significant interest in . . . protection of First Amendment liberties"); *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002) (upholding the grant of a preliminary injunction because the "public interest favors protecting core First Amendment freedoms"); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest.").  Thus, the public interest favors granting the requested injunction.

**CONCLUSION**

For the foregoing reasons, the court should grant this motion and issue the requested injunction.

Respectfully submitted,

**AMERICAN FREEDOM LAW CENTER**

/s/ *Robert J. Muise*
Robert Joseph Muise, Esq.* (MI P62849)
P.O. Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756; Fax: (801) 760-3901

/s/ *David Yerushalmi*
David Yerushalmi, Esq.* (DC # 978179)
1901 Pennsylvania Avenue NW, Suite 201
Washington, D.C. 20006
Tel: (646) 262-0500; Fax: (801) 760-3901

*Admitted *pro hac vice*

**DRINKER BIDDLE & REATH, LLP**

/s/ *Jason P. Gosselin*
Jason P. Gosselin
PA Bar ID 73682
Jason.gosselin@dbr.com
Brynne S. Madway
PA Bar ID 316422
Brynne.madway@dbr.com
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103-6996
Tel: (215) 988-2700; Fax (215) 988-2757

**CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2014, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: none.

**AMERICAN FREEDOM LAW CENTER**

*/s/ Robert J. Muise*
Robert J. Muise, Esq.