# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

AMERICAN FREEDOM DEFENSE :
INITIATIVE, PAMELA GELLER and :
ROBERT SPENCER, :
 :
    Plaintiffs, :
 : No.14-CV-05335-MSG
   v. :
 :
SOUTHEASTERN PENNSYLVANIA :
TRANSPORTATION AUTHORITY and :
JOSEPH M. CASEY, :
 :
    Defendants. :
_____:

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Seeking to wrap itself in the mantle of the First Amendment, the American Freedom Defense Initiative ("AFDI") employs this litigation to continue its assault on America's public transit authorities that do not surrender their transit vehicles to AFDI's uncivil advertisements. AFDI has already litigated actions against transit authorities in Boston, Seattle, the District of Columbia, New York City and Southeastern Michigan ("SMART"),[1] and recently sued the New York City authority again.[2] AFDI did not prevail in 4 of the 6 litigated suits – in Boston (twice), Seattle and Michigan – because its ads offended the minimal civility standards reasonably insisted upon by the public transit authorities in those jurisdictions or otherwise imposed upon the captive audience of transit passengers and employees. The same result should ensue in this case where AFDI employs reckless or knowing false statements of historical fact to draw a

---

[1] *See AFDI v. Suburban Mobility Auth. for Reg'l Transp. (SMART)*, 698 F.3d 885 (6th Cir. 2012); *AFDI v. King County*, No. 13-1804, 2014 WL 345245 (W.D. Wash. Jan. 30, 2014); *AFDI v. Massachusetts Bay Transp. Auth.*, 989 F. Supp. 2d 182 (D. Mass. 2013) and *AFDI v. Massachusetts Bay Transp. Auth.*, No. 14-10292, 2014 WL 1093138 (D. Mass. March 17, 2014); *AFDI v. Washington Metro. Area Transit Auth.*, 898 F. Supp. 2d 73 (D.D.C. 2012); *AFDI v. Metro. Transp. Auth.*, 880 F. Supp. 2d 456 (S.D.N.Y. 2012).

[2] *AFDI v. Metro. Transp. Auth.*, No. 14-7928 (S.D.N.Y.), filed October 1, 2014.

collaborative connection between one of the most despicable historical characters of all time –

Hitler[3] – and the Islamic faith.

## THE BACKGROUND OF THIS DISPUTE

*SEPTA's Advertising Program*

The Southeastern Pennsylvania Transportation Authority ("SEPTA") is the public

transportation provider serving the five county region of Southeastern Pennsylvania. SEPTA's

mission is to provide safe and efficient public transportation to the five county region. SEPTA

endeavors to carry out its public service mission with an acute sensitivity to the on-board

experience of its riders, winning the American Public Transportation Association's 2012

Outstanding Public Transportation System Achievement Award for its efforts to enhance

passenger service, efficiencies and overall effectiveness. As an integral part of its service

commitment, SEPTA includes in its public reports an express recognition of the fact that the

advertisements it allows to be placed on or in its vehicles reach passengers "in innovative and

enjoyable ways" that enhance the ridership experience. *See* SEPTA 2013 Annual Report at 28,

available at http://septa.org/strategic-plan/reports/annual-2013.pdf. Customer satisfaction is

central to SEPTA's public service mission and passenger revenues which, along with

government subsidies, constitute SEPTA's principal sources of revenue. *Id.* at 62.

The advertising that appears on SEPTA buses is solicited by Titan Outdoor LLC

("Titan"), with whom SEPTA has an advertising contract (the "Advertising Contract," attached

as Exhibit "A"). Titan's contract proposal, submitted to SEPTA before the contract award,

represented that Titan would implement an advertising sales plan that would "enhance your

[SEPTA's] riders' experience" and committed:

---

[3] As one federal court in this Circuit noted: "any images connected with Adolf Hitler or Nazi Germany would invoke thoughts of unspeakable acts." *DePinto v. Bayonne Bd. of Educ.*, 514 F. Supp. 2d 633, 644 (D.N.J. 2007).

2

> to ensure that advertisements are attractive, in full compliance with SEPTA's advertising standards and exceed the quality that SEPTA hopes to achieve.

Titan Proposal at 75 (attached as Exhibit "B").

The Advertising Standards to which Titan committed are embedded in the Advertising Contract (page 7) and advise Titan of types of advertising that will not be accepted by SEPTA. Among the thirteen categories of ads that will not be accepted are ads that glorify violence, ads that promote pornography, ads that are deceptive, ads that by their appearance diminish the enjoyment of passenger travel, and as particularly relevant here, ads that tend to "disparage or ridicule any person or group of persons on the basis of race, religious belief, age, sex, alienage, national origin or disability." Advertising Standards at (xi). In pursuing the contract award, Titan expressly committed to ensure that ads it submitted to SEPTA were in conformity with the Advertising Standards. Titan Proposal at 78. As a consequence, Titan did not solicit advertisements from businesses and organizations that would likely run afoul of the standards and endeavored to educate its customers as to the advertising content that would be acceptable to SEPTA. Goldsmith Affidavit at ¶ 12.[4]

Titan's solicitation program focuses on commercial enterprises and non-profit institutional bodies, such as colleges, museums, and the like. Titan does not solicit "issue ads." *Id.* at ¶ 13. Through Titan's prescreening of acceptable advertising, SEPTA maintains tight control of the advertisements to which its riders are exposed and thereby helps assure passengers a pleasant travel experience. Although SEPTA cannot provide the amenities of a limousine service, it endeavors to make commuting as pleasant as possible. Acceptance of advertisements

---

[4] "Goldsmith Affidavit" references are to the affidavit of Scott E. Goldsmith, attached to this Memorandum as Exhibit "C."

that use a broad brush (and misstatements) to disparage a religious faith would be at war with SEPTA's creation of a pleasant transit environment.

### AFDI's Ad Submission

On or about May 27, 2014, Scott Goldsmith ("Goldsmith"), Titan's Executive Vice President and Chief Commercial Officer, was contacted by Plaintiff Pamela Geller ("Geller") to purchase ad space on the sides of SEPTA buses for the advertisement attached to the Complaint as Exhibit "1" ("the Ad"). Titan did not solicit the Ad or otherwise invite its submission. Goldsmith Affidavit at ¶ 18. Goldsmith considered the Ad to be potentially incompatible with the Advertising Standards because it disparaged Muslims based on their religion. *Id.* at ¶ 19. Goldsmith nevertheless conveyed the Ad to SEPTA because he was aware that AFDI had pursued litigation against transit authorities that declined to accept the Ad and similar advertisements. *Id.* at ¶ 20.

The Ad reached Titan unaccompanied by any explanation of its origins, purpose or sources, notwithstanding the inclusion in the Ad of categorical statements of fact that appear to be erroneous, confusing and/or misleading on their face, specifically: there is no single "leader of the Muslim world;" the statement that hatred of Jews has basis in the Qur'an is, at best, unbalanced; and the source-free statement that two thirds of all US aid goes to Islamic countries appears to count anti-terrorist spending in Iraq, Afghanistan and elsewhere. Moreover, on a moving vehicle the hodge-podge of facts in the Ad could easily be misconstrued to be anti-Jewish. SEPTA's expert witness has confirmed that the legend underneath the picture of Hitler in the Ad is an outright fabrication. *See* Expert Report of Dr. Jamal J. Elias attached to this Memorandum as Exhibit "D." Neither SEPTA nor Titan have ever received clarification of

4

these issues, and discovery will be required to determine the full extent of Plaintiffs' misstatements.

***SEPTA's Disposition of the Ad***

Upon review of the Ad, SEPTA considered it incompatible with the Advertising Standards. Kelly Affidavit at ¶ 20.[5] A consensus was reached with Titan that SEPTA's position would be communicated to Geller and AFDI. As a result, and in accordance with the Advertising Contract, Titan sent the following email response to Geller on June 3, 2014:

> Pamela: The following is the official response from SEPTA in regard to your proposed advertisement:
>
> 1. SEPTA has reviewed your proposed ad and has determined that it does not comply with the advertising standards in Titan's agreement with SEPTA.
>
> 2. The ad does not comply with Section 9(b)(xi) which prohibits "Advertising that tends to disparage or ridicule any person or group of persons on the basis of race, religious belief, age, sex, alienage, national origin, sickness or disability."
>
> 3. SEPTA and Titan would be happy to review another proposed advertisement or discuss the reasons for the denial.

Kelly Affidavit at ¶¶ 22, 23. AFDI neither submitted another advertisement nor entered into discussion with SEPTA or Titan. *Id.* at ¶ 24. Instead, more than three months later Plaintiffs brought this lawsuit. *See id.* at ¶ 25.

## ARGUMENT

To obtain a preliminary injunction, the movant must establish: "'(1) a likelihood of success on the merits; (2) that [he] will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.'" *Wesley v. Sec'y Pa. Dep't of Corr.*, 569 F. App'x

---

[5] "Kelly Affidavit" references are to the affidavit of Thomas J. Kelly, Jr., attached to this Memorandum as Exhibit "E."

123, 125 (3d Cir. 2014) (affirming denial of motion for preliminary injunction) (citation omitted). Both the Third Circuit and the Supreme Court have described the remedy supplied by a preliminary injunction as an "extraordinary remedy." *Id.* (citation omitted); *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) ("A preliminary injunction is an 'extraordinary and drastic remedy' . . . it is never awarded as of right.") (citations omitted). Because of the unusual nature of the relief, a preliminary injunction "'may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, No. 13-2290, 2014 WL 4194094, at *7 (3d Cir. Aug. 26, 2014) (affirming denial of motion for preliminary injunction) (citation omitted).

Courts are especially wary of ordering preliminary relief that seeks a mandatory injunction, "*i.e.,* one that orders a responsible party to 'take action.'" *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 484 (1996). Applications for mandatory injunctions are subjected to close scrutiny. *United States v. City of Philadelphia*, No. 06-4592, 2006 WL 3922115, at *1 (E.D. Pa. Nov. 7, 2006).

## I.     A SEPTA Bus Is Not A Public Forum

Because SEPTA has for some time (at least since 2005) consistently maintained control over the kinds of advertisements that can appear on its buses, those vehicles have the attributes of a nonpublic forum. The First Amendment does not guarantee a forum for all constitutionally protected speech on government-owned property. *Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 761 (1995). To balance the government's interest in regulating the use of its property and the public's interest in First Amendment access, courts employ a multi-tiered forum analysis delineating three types of fora and levels of judicial scrutiny for each;

(1)  public fora by "tradition;"

(2)  public fora by "designation;" and

(3)  nonpublic fora.

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800-02 (1985).

Plaintiffs concede that a SEPTA bus is not a traditional public forum because buses are unlike sidewalks, streets and parks which largely populate this category of fora.  MOL[6] at 9. Indeed, public transit vehicles are generally considered a poor venue for establishment of public fora because they exploit a captive audience, making government control of the forum appropriate.  In *Lehman v. City of Shaker Heights*, a political candidate sued the City of Shaker Heights when it refused to display his campaign advertisement on its buses.  418 U.S. 298, 303-05 (1974).  The Court noted that transit advertising is different from other fora:

> . . . viewers of billboards and streetcar signs [have] no 'choice or volition' to observe such advertising and [have] the message 'thrust upon them by all the arts and devices that skill can produce . . . The radio can be turned off, but not so the billboard or the streetcar placard.' [citation omitted]  'The streetcar audience is a captive audience.  It is there as a matter of necessity, not of choice.' [citations omitted] . . .  In such situations, '(t)he legislature may recognize degrees of evil and adapt its legislation accordingly.' [citations omitted].

*Id.* at 302 (citing *Packer Corp. v. Utah*, 285 U.S. 105, 110 (1932)).  The Court found neither a constitutional violation, nor the indicia of a traditional or designated public forum, stating:

> *Here, we have no open spaces, no meeting hall, park, street corner, or other public thoroughfare.  Instead, the city is engaged in commerce.*  It must provide rapid, convenient, pleasant, and inexpensive service to the commuters of Shaker Heights.  The car card space, although incidental to the provision of public transportation, is a part of the commercial venture.  In much the same way that a newspaper or periodical, or even a radio or television station, need not accept every proffer of advertising from the general public, *a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles.*

---

[6] "MOL" refers to Plaintiffs' Brief in Support of Motion for Preliminary Injunction.

*Lehman*, 418 U.S. at 303 (emphasis added). In Philadelphia, 35.7 % of households do not have access to a vehicle and are dependent on SEPTA for their mobility. In these circumstances, government must be especially vigilant in assuring that passengers, who have few, if any, other transportation options are not forced to endure ads that detract from the transit experience by lowering the level of civil discourse. *See* SEPTA 2014 Operating Budget at 14, available at http://septa.org/strategic-plan/reports/opbudget14.pdf.

In distinguishing between a designated public forum and a nonpublic forum, courts focus on whether the government intentionally opened the forum for public discourse. *AFDI v. Suburban Mobility Auth. for Reg'l Transp. (SMART)*, 698 F.3d 885, 890 (6th Cir. 2012); *Christ's Bride Ministries, Inc. v. SEPTA,* 148 F.3d 242, 248 (3d Cir. 1998) (a designated public forum is created where the government intends to open a non-traditional forum for public discourse); *Uptown Pawn & Jewelry, Inc. v. City of Hollywood*, 337 F.3d 1275, 1278 (9th Cir. 2003) (similar). The courts are guided not only by the government's explicit statements, policy and practice, but also by the nature of the property and its compatibility with expressive activity to discern the government's intent. *Cornelius,* 473 U.S. at 802.

Plaintiffs attempt to sidestep the teachings of *Lehman* (that buses are unlikely candidates for classification as designated public fora) by pointing to a case that adjudicated SEPTA's advertising practices as they existed 17 or more years ago, *Christ's Bride Ministries, Inc. v. SEPTA*, 148 F.3d 242 (3d Cir. 1998) (finding a designated public forum). Because a SEPTA bus is a designated public forum, say Plaintiffs, SEPTA's restrictions on speech are subject to strict scrutiny. MOL at 10-11. But *Christ's Bride* does not address SEPTA's current practices and is therefore not dispositive of the forum issues raised by Plaintiffs' claim. "[T]he government 'is not required to indefinitely retain the open character of the facility.'" *Storti v. SEPTA*, No. 99-

2159, 1999 WL 729266, at *4 (E.D. Pa. Sept. 10, 1999), quoting *Cornelius*, 473 U.S. at 802. *See also NAACP v. City of Philadelphia*, No. 11-6533, 2014 WL4099317, at *5 (E.D. Pa. Aug. 1, 2014) (even if a forum was at one point a designated public forum, a government may redefine it as a non-public or limited public forum).

When *Christ's Bride* was decided, SEPTA's intention was signaled by an affirmative written policy ("TDI Cares") that encouraged advertisements on issues of public concern. *Christ's Bride*, 148 F.3d at 249. SEPTA no longer adheres to that program. Kelly Affidavit at ¶ 18. Inasmuch as SEPTA's Advertising Standards had not been formulated when *Christ's Bride* was decided, SEPTA had few specific restrictions on the types of advertising it would accept, and none that addressed the advertisement then before the Court. *See Christ's Bride*, 148 F.3d at 251, 253. SEPTA's current practices – which do not encourage public interest ads and require adherence to SEPTA's Advertising Standards – dictate a different result than was reached under the unique circumstances that existed when *Christ's Bride* was decided.

SEPTA now reasonably requires that advertisements submitted to it conform to its Advertising Standards. Because advertisements that do not conform to the Advertising Standards are not solicited and potential advertisers are made aware of the Advertising Standards before submission, noncompliant advertisements are rarely submitted to SEPTA. Kelly Affidavit at ¶ 15; Goldsmith Affidavit at ¶ 14. On the rare occasion when a potentially noncomplying advertisement is submitted to SEPTA, SEPTA requires it be brought into conformity with the Standards. The grounds for requiring resubmission have included immodest physical displays, depiction of weapons, and offensive language. Kelly Affidavit at ¶ 16; Goldsmith Affidavit at ¶ 15. Although Titan does not solicit public interest ads, on infrequent occasions advertisements that addressed a matter of public policy such as teacher seniority have

been accepted by SEPTA so long as the ads fully complied with SEPTA's Advertising Standards, which they have. Kelly Affidavit at ¶ 17.

Plaintiffs' suggestion that SEPTA's acceptance of an occasional advertisement on a controversial topic or conveying a religious message signals an intention to open a public forum is erroneous. SEPTA is not put to an all or nothing choice. *Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 81 (1st Cir. 2004) (refusal to limit advertising program solely to commercial advertising did not evidence an intent to open the forum to all public discourse). The allowance of limited discourse does not create a designated public forum. *Christ's Bride*, 148 F.3d at 248, citing *Cornelius,* 473 U.S. at 802. The detailed substantive and procedural limitations in the Advertising Standards define the forum SEPTA intends to create. Thus, while SEPTA has allowed some speech on a variety of issues, it has not allowed *all* speech. All ads, including public policy ads, must pass muster under the civility/non-disparagement and other restrictions found in the Advertising Standards.

SEPTA's intention to create a nonpublic forum for advertising on its buses is made clear by its program for soliciting and approving advertisements that tightly controls their appearance, decorum and civility, and thereby "evinces an intent . . . to control access to the forum carefully." *NAACP v. City of Philadelphia*, No. 11-6533, 2014 WL 4099317, at *10 (E.D. Pa. Aug. 1, 2014) (nonpublic forum found); *Nieto v. Flatau*, 715 F. Supp. 2d 650, 654-55 (E.D.N.C. 2010) (regulations prohibiting the display of extremist, indecent, sexist or racist messages on motor vehicles evidenced intent not to create a public forum).

Classifying a bus as a nonpublic forum is consistent with the "'long-settled principle' that when the government acts in its position as a proprietor to manage its internal operations, as opposed to using its power as a regulator or lawmaker, those governmental actions are subject to

a lower level of First Amendment scrutiny." *Uptown Pawn & Jewelry, Inc.*, 337 F.3d at 1278 (speech restrictions on bus benches), citing *United States v. Kokinda*, 497 U.S. 720, 725 (1990) (speech restrictions on postal sidewalk, but citing ads on transit vehicles as similar); *see Lebron v. National Railroad Passenger Corp. (AMTRAK)*, 69 F.3d 650, 658-59 (2d Cir. 1993) (speech restrictions on advertising space in Penn Station).

On facts similar to those before this Court, in one of the lawsuits brought by AFDI against the several transit authorities that rejected its ads, the United States District Court for the Western District of Washington found that Titan's process of screening proposed transit ads for compliance with advertising standards similar to SEPTA's was evidence of an intention to create a limited public (*i.e.,* nonpublic) forum, requiring only that speech restrictions be reasonable and viewpoint neutral.[7] *AFDI v. King County*, No. 13-1804, 2014 WL 345245, *4-5 (W.D. Wash. Jan. 30, 2014). Because SEPTA clearly intends to and has created a nonpublic forum in its buses, it need only show (as other transit companies rejecting similar ads have shown) that its decision not to accept the Ad was reasonable and therefore did not offend the First Amendment.

## II.     SEPTA's Advertising Standards Are Reasonable and Viewpoint Neutral

Assuming the Ad is protected speech (which it is not, for the reasons stated below) and the forum created by SEPTA is nonpublic (which it is, for the reasons stated above), the Supreme Court has held that "a government entity may impose restrictions on speech that are reasonable and viewpoint neutral." *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009) (citation omitted). *See also Cornelius*, 473 U.S. at 806 ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable

---

[7] As pointed out by Judge Rufe in her thoughtful opinion in *NAACP v. City of Philadelphia*, No. 11-6533, 2014 WL 4099317, at *4 (E.D. Pa. Aug. 1, 2014), there is some confusion over what categories of fora exist. As the category "limited public forum" is most recently construed by the federal courts, it replaces the "nonpublic forum" category. *Id.*

in light of the purpose served by the forum and are viewpoint neutral") (citation omitted). SEPTA's Advertising Standards meet both criteria.

Whether a restriction on speech is "reasonable" depends on whether differential access is consistent with preserving the property for the purpose to which it is dedicated. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 50-51 (1983). A "restriction 'need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation.'" *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 683 (1992) (emphasis in original; citation and internal quotations omitted). Accordingly, there is no requirement "that the restriction be narrowly tailored or that the Government's interest be compelling." *Cornelius*, 473 U.S. at 808-09 (citations omitted). "The reasonableness of the Government's restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *Id.* at 809. This has led the Supreme Court to approve of transit system advertising restrictions that were instituted "in order to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience." *Lehman v. City of Shaker Heights*, 418 U.S. 298, 304 (1974).

SEPTA's non-disparagement restriction was clearly reasonable given the purpose of the forum and all the surrounding circumstances. A central feature of SEPTA's advertising program is the principle that the advertisements allowed on transit vehicles enhance the transit environment for SEPTA's riders. The advertising program's focus on the transit experience of SEPTA also protects passenger revenues which, along with government subsidies, constitute SEPTA's principal sources of revenue. AFDI's "Jew-Hatred" Ad is not "perfectly compatible" with these goals (MOL at 22), as Plaintiffs implicitly concede in rejecting any suggestion the Ad be *toned down*. *See* MOL at 17. Not to dwell on the obvious, but comparisons to Hitler, like that

12

in the Ad, are "extremely offensive." *Herrnreiter v. Chicago Housing Author.,* No. 98-5209, 2001 WL 856623, at *7 (N.D. Ill. July 30, 2001). AFDI's Ad is worse yet because it draws a *false* association with Hitler. *See* Section III, below.

Although Plaintiffs contend that the enforcement of civility standards is a "fool's errand" under the First Amendment" (MOL at 13), the federal courts have not agreed. *See Ridley v. Massachusetts Bay Transp. Author.,* 390 F.3d 65, 93 (1st Cir. 2004) (holding that MBTA's advertising regulations that included a civility restriction were "eminently reasonable"); *AFDI v. King County,* No. C13-12804, 2014 WL 345245, at *6 (W.D. Wash. Jan. 30, 2014) (terming such restrictions "reasonable restrictions that promote the safety, reliability and quality of the public transit system"); *AFDI v. Massachusetts Bay Transp. Auth.,* 989 F. Supp.2d 182, 189-92 (D. Mass. 2013) (transit authority was reasonable in excluding demeaning or disparaging ad content); *see also AFDI v. Suburban Mobility Auth. for Reg'l Transp. (SMART),* 698 F.3d 885, 894-96 (6th Cir. 2012) (ban on political ads reasonable and viewpoint neutral).[8]

The reasonableness of SEPTA's non-disparagement provision is not impacted by the fact that AFDI will pay to run its Ad. *See* MOL at 22. The generation of advertising revenue, a minor revenue item, is clearly subsidiary to SEPTA's commitment to provide a safe, efficient and pleasant transit experience which, in turn, affects passenger revenues, SEPTA's primary non-subsidy source of revenue. The advertising copy that SEPTA allows on its transit vehicles clearly impacts the ridership experience and the non-disparagement restriction helps to ensure a courteous and respectful transit environment. *See King County,* 2014 WL 345245 at *5.

---

[8] In the two cases in which AFDI prevailed, the transit authority either conceded it provided a public forum, requiring strict scrutiny of the transit authorities' speech restriction, *see AFDI v. Washington Metro. Area Transit Author.,* 898 F. Supp. 2d 73, 78-79 (D.D.C. 2012), or a designated public forum was found, *see AFDI v. MTA,* 880 F. Supp.2d 456, 472 (S.D.N.Y. 2012) (based on *stare decisis*).

SEPTA's Advertising Standards further pass First Amendment scrutiny because they are viewpoint neutral as well as reasonable. Generally speaking, a regulation is viewpoint-based if it suppresses the expression of one side of a particular debate. *Lamb's Chapel v. Ctr. Moriches Union Free Sch.,* 508 U.S. 384, 393 (1993). Viewpoint neutrality demands that the state not suppress speech where the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses. *See Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829 (1995); *McGuire v. Reilly,* 386 F.3d 45, 62 (1st Cir. 2004) ("The essence of a viewpoint discrimination claim is that the government has preferred the message of one speaker over another.").

There is no evidence that SEPTA discriminated against Plaintiffs' point of view. Plaintiffs point to no occasion on which SEPTA accepted any advertisement even remotely relating to the subject matter of the Ad. While it is true that SEPTA may have accepted an occasional ad announcing a religious gathering or promoting awareness of an obscure issue like teacher seniority, *see* MOL at 3-4, those actions imply nothing about whether SEPTA had or employed a viewpoint animus in its subsequent decision not to accept Plaintiffs' Ad that addressed another subject altogether.

> We reject the argument that because a government commercial enterprise has opened up discussion on one particular "topic" (say, religion), it must allow any and all discussion on that topic. Reasonable ground rules, so long as they are not intended to give one side an advantage over another, can be set without falling prey to viewpoint discrimination. It is possible that the effect of these guidelines will fall more heavily on some messages than others in certain contexts, but this does not itself make the guidelines viewpoint discriminatory; the intent and chief impact of the non-demeaning requirement is merely to ensure a certain minimum level of discourse that is applicable to everyone.

*Ridley v. Massachusetts Bay Transp. Author.,* 390 F.3d 65, 91-92 (1st Cir. 2004).

SEPTA's non-disparagement restriction is viewpoint neutral inasmuch as it applies regardless of point of view.

> Is the MBTA required to accept speech that violates those "reasonable ground rules" when applying those rules would render the message less effective? *Ridley* did not directly answer that question either but the opinion suggests that excluding demeaning or disparaging speech does not tilt the playing field because the requirement to be civil applies to every speaker equally. *See id.* at 91. Thus, the Court finds that plaintiffs do not have the right to use whatever terms they wish to use in a non-public forum simply because they are the most effective means of expressing their message.

*AFDI v. Massachusetts Bay Transp. Auth.*, 989 F. Supp. 2d 182, 190 (D. Mass. 2013).

Of course, in contending SEPTA's failure to approve the Ad was both unreasonable and viewpoint-based, Plaintiffs do not address the falsity of the Ad. It is neither unreasonable nor viewpoint-based to preclude false advertisements from SEPTA buses and no case holds otherwise. As a result, this Court should deny Plaintiffs' Motion for a Preliminary Injunction because the restriction was reasonable and viewpoint neutral.

## III. Plaintiffs' "Islamic Jew-Hatred" Ad Is Not Protected Free Speech

It has long been a principle of constitutional jurisprudence that "[f]alse statements of fact are particularly valueless [b]ecause they interfere with the truth-seeking function of the marketplace of ideas." *Hustler Magazine v. Falwell*, 485 U.S. 46, 52 (1988); *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) ("[T]here is no constitutional value in false statements of fact"). Although careless misstatements are inevitable in the course of free debate and are therefore tolerated, *Falwell*, 485 U.S. at 52, that is not this case. Intentional misstatements of fact have historically enjoyed little constitutional protection.

> Calculated falsehood falls into that class of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived

15

> from them is clearly outweighed by the social interest in order and
> morality. * * *' *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572,
> 62 S.Ct. 766, 769, 86 L.Ed. 1031. Hence the knowingly false
> statement and the false statement made with reckless disregard of
> the truth, do not enjoy constitutional protection.

*Garrison v. Louisiana*, 379 U.S. 64, 75 (1964); *see also Brenner v. Brown,* 36 F.3d 18, 20 (7th

Cir. 1994) ("even if the speech ... involved a matter of public concern, an employee's speech is

not protected where it is made with a reckless disregard for the truth...."); *American Postal*

*Workers Union, AFL-CIO v. United States Postal Service*, 830 F.2d 294, 306 (D.D.C. 1987)

("[I]ntentional falsehoods are among the forms of expression least deserving of first amendment

protection").

Despite established jurisprudence, the First Amendment status of false statements of fact

was thrown into disarray by the decision of the United States Supreme Court in *United States v.*

*Alvarez*, 132 S. Ct. 2537 (2012). *Alvarez* held the Stolen Valor Act, which criminalized falsely

representing oneself to have been awarded any decoration or medal authorized by Congress for

the Armed Forces, facially unconstitutional. There was no majority opinion in *Alvarez.* A

majority of the Justices seemed to reject the idea that false facts have no value, but a majority

also appeared to agree that such speech is of reduced (the dissent said no) constitutional value.

*See Alvarez*, 132 S. Ct. at 2553-54 (Breyer, J., concurring, joined by Kagan, J.); *id.* at 2561

(Alito, J., dissenting, joined by Scalia, J. and Thomas, J.). The decision does not provide a clear

answer to the question: How should the First Amendment treat factual lies? *See* V. Amar, A.

Brownstein, *The Voracious First Amendment: Alvarez and Knox in the Context of 2012 and*

*Beyond*, 46 LOY. L.A. L. REV. 491 (Winter 2013).

The opinions of a majority of the Court in *Alvarez*, in fact, offer no rationale for

displacing the substantial body of precedent holding that false factual statements are entitled to

little or no constitutional protection. Justices Breyer and Kagan, in their concurring opinion, embraced those cases, but carved out exceptions where criminalization of false statements might chill protected speech (not this case) and where factual false statements may serve useful human objectives like protecting people from embarrassment, protecting privacy, shielding persons from prejudice, preserving calm in the face of danger and the like (considerations that are not applicable here). 132 S. Ct. at 2553. Justices Alito, Scalia and Thomas dissented because, in their view, "false statements of fact merit no First Amendment protection in their own right." *Id.* at 2562 (with exceptions not relevant here). But even the plurality opinion of the Court focused on suppression of speech and not whether government must afford a forum for deliberate falsehoods. *See, e.g., id.* at 2547, 2550.[9] Neither *Alvarez* nor any other case therefore holds that a government body acting in a proprietary capacity must enable the dissemination of misinformation, albeit lies, using the government's facilities.

There can be no doubt that the centerpiece of the Ad – a photograph of Hitler with Haj Amin al-Husseini, dubbed "the leader of the Muslim world" and Hitler's "staunch ally" – is patently false. Dr. Jamal Elias, former Chair of the Department of Religious Studies at the University of Pennsylvania, the Walter H. Annenberg Professor of the Humanities and an eminent scholar of Islam and Muslim society,[10] in his attached Affidavit (Exhibit D), explains

---

[9] The plurality also suggests that the remedy for speech that is false is speech that is true. *Alvarez,* 132 S. Ct. at 2550. That remedy is not universally effective, as the courts have observed.

> If the nature of the charges are such as to make a reply ineffective, then no amount of time to reply can cure the problem. . . . [T]he only practical way to reply to a charge of being a shyster is to answer that one is not a shyster. Such a response to an inflammatory accusation repeated time after time is probably as damning as the original accusation.

*Hanes Corp. v. N.L.R.B.,* 677 F.2d 1008, 1013-14 (4th Cir. 2982). *See Gertz,* 418 U.S. at 344 n.9 ("an opportunity for rebuttal seldom suffices to undo the harm of defamatory falsehood"-"truth rarely catches up with a lie").

[10] Among his many credentials are Dr. Elias' designation as a Guggenheim Fellow, a Fellow at the Katz Center for Advanced Judaic Studies, and Islam Section Head (American Academy of Religion, N.E. Region). Dr. Elias has

why the caption appearing under the photograph ("Adolf Hitler and his staunch ally, the leader of the Muslim world, Haj Amin al Husseini") is absolutely false:

i. Islam lacks any clerical hierarchy that would recognize one individual as its leader. It is also a religion with many sects and denominations, such that one group does not recognize the leadership of another. As such, it is completely incorrect to refer to any one individual as "*the* leader of the Muslim World" [emphasis added].

ii. Mr. Haj Amin al-Husseini (*aka* al-Husayni, d. 1974) served from 1921-1937 as the Mufti of Jerusalem, which was administered at that time as a district center in the British Mandate territory of Palestine. It was in no way the center of the Muslim world.

iii. The office of "Grand Mufti" is one created by the British, since "Grand Mufti" is not a traditional Islamic title but originated in the English language. The closest traditional Islamic title is *Mufti 'Amm*, which would translate as "Common Interpreter," or "General Enunciator." "Grand" is nowhere in the traditional title.

iv. The office of Mufti is not one of a spiritual or theological leader. It is a religious juridico-legal office of someone who pronounces opinions in response to questions posed to him. Muftis, like judges, normally are civil servants appointed by a government. Unlike judges (called Qadis in the Islamic context), the opinions of Muftis normally are nonbinding, therefore this position cannot be seen as one of leadership through state authority either.

v. Mr. Al-Husseini was appointed by the British Empire to succeed his brother in this post in 1921. His brother had succeeded their father, who was the first "Grand Mufti" of Jerusalem, demonstrating that this is a new title with no broad recognition in the Muslim world. In 1922, he was appointed to other administrative posts in British Mandate Palestine by the British High Commissioner, not by a recognized Muslim authority.

vi. The Ottoman Empire -- which is where the titular head of the Sunni Muslim community was based and from which the British seized the territory of Palestine and its capital, Jerusalem – did not recognize the British appointed Mufti. In fact, the Ottoman Empire maintained that its own appointee, Asad Shuqeiri, was the legitimate Mufti of Jerusalem.

vii. Following his implication in political activities in Palestine, Mr. Al-Husseini was stripped of his posts and exiled in 1937. He fled to Lebanon, and later to Iraq where pro-Axis Arab nationalists (not religious authorities) made him their diplomatic contact to the Axis powers. He was forced to flee to Iran in May 1941, and in October of that year Italian diplomats took him to Italy where he met Mussolini. He traveled to Germany the following month to meet with Hitler. His public demands of Germany (issued in January 1941), were as follows: (a) a request for help in the Arab struggle for independence from the French and the British; (b) the right of liberated Arab states to form some sort of union; and (c) the right of Palestinian Arab authorities to veto the proposal for a Jewish homeland in Palestine. All these demands concerned

---

taught courses on Qur'anic Studies (graduate), Islam and Modernity, Islam in the Modern World, Mohammad and the Qur'an, Introduction to Islam, and History of Islamic Civilization, among others.

issues of Arab and Palestinian nationalism, not Islamic religion. At the end of World War II, the first Muslim-led government to have control of the city of Jerusalem was the Hashemite Kingdom of Jordan, and it never acknowledged Mr. Al-Husseini's claim to religious authority. He was unable to return to Jerusalem even when it was under Islamic authorities, and lived out the rest of his life in exile in Beirut.

In summary, for a period of time Mr. Al-Husseini held titles and offices given to him by the British Empire, and ones that contradicted the previous Islamic offices in the very town where he held his appointment after it was seized by the British. To call him "the leader of the Muslim world" is manifestly false.

Exhibit D. In short, the Hitler photograph and legend – the centerpiece of the Ad and the part Plaintiffs specifically refuse to *tone down* – is wrong as a matter of historical fact from so many perspectives that it is at least a reckless, if not deliberate, falsehood. The reasons the statement is false are not based on technical, peripheral facts; the problems with the statement are fundamental. Plaintiffs anoint al-Husseini with a non-existent leadership position, to wit, "the leader of the Muslim world." In fact, al-Husseini's status was colonially-derived (he was appointed by the British), regionally delimited, religiously detached (holding a non-Islamic title of civil nature) and, which even so, was not recognized by the Sunni population and was never recognized by any Muslim government. There is not even a sliver of truth in Plaintiffs' statement.

The Constitution does not guarantee the right to spread lies for the purpose of denigrating others. Daniel Patrick Moynihan put it best in his celebrated observation that –

**Everyone is entitled to his own opinion, but not his own facts**.

George F. Will, The Wisdom of Pat Moynihan, Washington Post (Oct. 3, 2010).[11]

### IV.    Plaintiffs Are Not Entitled To Injunctive Relief

For the reasons set forth above, Plaintiffs cannot show a likelihood of success on the merits. A SEPTA bus is no more than a nonpublic forum for which SEPTA is entitled to impose

---

[11] The suggestion that the Qur'an teaches Jew-Hatred is also unfair and erroneous. *See* Exhibit D at 2.

reasonable, viewpoint-neutral restrictions to access, as SEPTA has done. Were Plaintiffs to overcome these barriers, they would still not be entitled to a preliminary injunction for the reasons that follow.

### A. Because Plaintiffs Come to This Court With Unclean Hands, They Are Not Entitled to an Injunction

One of the most fundamental requirements of equity is that applicants come to the court with clean hands.

> This maxim [of clean hands] is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.

*Monsanto Co. v. Rohm & Haas Co.,* 456 F.2d 592, 598 (3d Cir. 1972). As the United States District Court for the District of Massachusetts recently explained in denying AFDI's motion for preliminary injunction, "[t]he Court has discretion . . . to deny equitable relief to a party that has acted in bad faith or with unclean hands. . . ." *AFDI v. Massachusetts Bay Transp. Auth.*, No. 14-10292, 2014 WL 1093138, at *3 (D. Mass. March 17, 2014) (citations omitted);[12] *see Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 819-20 (1945) ("inequitable conduct impregnated [plaintiff's] entire cause of action and justified dismissal by resort to the unclean hands doctrine") (citation omitted).

This Court has often denied requests for injunctive relief where the plaintiff entered the courthouse with unclean hands. *See Young v. Vaughn*, No. 98-4630, 1999 WL 155711, at *3-4 (E.D. Pa. March 19, 1999) (stating the standard that "[t]he doctrine of unclean hands bars a claim 'only if (1) a party seeking affirmative relief (2) is guilty of conduct involving fraud, deceit,

---

[12] The doctrine of unclean hands applies when, as here, a plaintiff's misconduct is directly related to the merits of the controversy between the parties. *Id.*

unconscionability, or bad faith (3) directly related to the matter in issue (4) that injures the other party and (5) affects the balance of equities between the litigants'" and denying injunction) (citations and internal quotations omitted); *Salomon Smith Barney Inc. v. Vockel*, 137 F. Supp. 2d 599, 602-04 (E.D. Pa. 2000) (denying motion for preliminary injunction where plaintiff sought "the help of a court of equity to prevent the same conduct by [defendant] which it had previously abetted and from which it has handsomely profited").[13]

The doctrine of unclean hands operates to bar Plaintiffs from receiving injunctive relief in the context of this case. Entreating the Court to use one of the Bill of Rights to require the government to post an advertisement based on a lie and that demeans and disparages the religious faith of a large segment of the community clearly invokes the doctrine of unclean hands to bar Plaintiffs' request for injunctive relief. Plaintiffs do not deny that they then ignored SEPTA's offer to discuss ways to bring the Ad into compliance with the Advertising Standards. When SEPTA, through Titan, rejected the Ad on June 3, Titan stated in pertinent part that it was "happy to review another proposed advertisement or discuss the reasons for the denial." Complaint ¶ 26. Rather than work with SEPTA and Titan in good faith, AFDI proceeded in bad faith by simply requesting and receiving more information about SEPTA's Advertising Standards and later filing suit. *Id.* at ¶¶ 27-31. Plaintiffs made no effort to accommodate its agenda to SEPTA's mission or otherwise to find a non-litigation alternative. In other words, AFDI acted in bad faith by intentionally submitting its improper Ad and then refusing to either work with SEPTA on another proposal or even discuss the full reasons for the denial.

---

[13] In labor law, the doctrine has been codified and applied to deny injunctive relief. *See* 29 U.S.C. § 108 ("No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."); *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Eastern Air Lines, Inc.*, 121 B.R. 428, 436 (S.D.N.Y. 1990) (vacating bankruptcy order granting preliminary injunction where airline "did not enter the federal courthouse with clean hands"), *aff'd*, 923 F.2d 26 (2d Cir. 1991).

Furthermore, as explained above, the falsities on which the Ad is based evidence extreme bad faith and unclean hands, without more. Even now, Plaintiffs boldly (and wrongfully) proclaim that they will not alter the pernicious and false Hitler portions of the Ad because it would rob the Ad of its effectiveness. MOL at 17-18. This strident stance reveals the Plaintiffs' reckless intention to disparage Muslims by falsely associating the Islamic faith with Hitler no-matter-what. Because Plaintiffs come to the Court with unclean hands, their Motion for Preliminary Injunction should be denied.

### B. Plaintiffs Cannot Show That They Will Suffer Irreparable Harm If An Injunction Does Not Issue.

Plaintiffs erroneously assume this Court will afford them an automatic presumption that they will suffer irreparable harm if an injunction is not granted. MOL at 23. Plaintiffs appear unaware that the Third Circuit has retreated from the automatic presumption of irreparable harm in First Amendment cases.

> While other circuits relax the irreparable harm requirement in First Amendment cases, our Court requires a First Amendment plaintiff seeking a preliminary injunction to prove irreparable harm.

*Conchatta, Inc. v. Evanko*, 83 F. App'x 437, 442 (3d Cir. 2003) (affirming the denial of a motion for a preliminary injunction). In addition, the Court went on to note that earlier precedent affording a presumption of irreparable harm —

> addresses the requisite *duration* of a deprivation of First Amendment rights, but does not suggest that a real or threatened deprivation need not occur. In several cases, we have quoted this statement in the course of holding that irreparable injury had been shown, but in all those cases actual or threatened irreparable harm was shown.

*Id.* at 442 n.3 (emphasis in original; citations omitted). In the circumstances of this case, requiring a showing of irreparable harm is not a mere technicality. Plaintiffs *will not* suffer irreparable, indeed any, harm for any amount of time because their Ad disseminates a lie.

Because there is no value in false statements of fact, *Gertz*, 418 U.S. at 339–40, quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), it follows that there is no irreparable harm that can be cognizable arising from this Court's failure to issue the injunction sought by Plaintiffs.

Any presumption of irreparable harm is also neutralized by Plaintiffs' delay in pursuing relief in this Court. *See Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) ("[T]he failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury."). Over three months passed after SEPTA declined to accept the Ad before Plaintiffs brought suit. Plaintiffs offer no explanation for the delay although courts regularly find in such circumstances that it precludes a showing of irreparable harm. *See Fund for Animals v. Frizzell,* 530 F.2d 982, 987 (D.C. Cir. 1975) (denying preliminary injunctive relief and noting that a delay of forty-four days after final regulations were issued was "inexcusable"); *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 43-44 (D.D.C. 2000) (noting that an over two-month delay "further militates against a finding of irreparable harm"); *see also Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276-77 (2d Cir. 1985) (ten-week delay in seeking an injunction against a trademark infringement "undercuts the sense of urgency" and suggests that no irreparable injury was threatened). "[C]ourts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Gidatex, S.R.L. v. Campaniello Imps., Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998). Plaintiffs' three month delay alone is therefore sufficient for the Court to conclude that Plaintiffs have not met their burden to establish irreparable harm.

### C. The Balance of Hardships and the Public Interest Do Not Favor An Award of Injunctive Relief

Granting preliminary relief will most certainly result in greater harm to SEPTA than to Plaintiffs. AFDI's misleading Ad and related conduct – which amount to unclean hands – should

23

not be rewarded by way of a mandatory injunction that requires SEPTA to act. In addition, SEPTA should not be forced to suffer a potential decrease in ridership, as posting the Ad could absolutely lead to persons of any faith refusing to use SEPTA's services because of principle, an unpleasant transit environment or safety concerns. For these same reasons, it is not in the public's interest that SEPTA run AFDI's Ad. Rather, the public interest will be best served by allowing SEPTA to continue uninterrupted with its mission: to deliver customer-sensitive public transit services for the citizens of the five county region of Southeastern Pennsylvania.

SEPTA's relations with its transit workers, some of whom are Muslim, are also adversely impacted by the Ad. SEPTA should not be forced to require its Muslim employees to choose between working on transit vehicles plastered with advertisements offensive to their religion or suffering a loss of income or discipline if they decline to work. *See Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 823 (4th Cir. 2004) (Gregory, concurring) (Confederate flag may create a non-frivolous claim for a hostile work environment under Title VII), *cited with approval in Storey v. Burns Int'l Sec. Services*, 390 F.3d 760, 765 n.15 (3d Cir. 2004). It matters not whether the Ad, standing alone, would create a "hostile work environment." Both SEPTA and its workers would suffer injury by virtue of the turmoil and potential expense associated with forcing Muslim employees to operate, clean and maintain transit vehicles emblazoned with statements and images demeaning their religious beliefs. Plaintiffs, although the instigators of the dispute, would be mere bystanders to more of the collateral carnage they have created by their Ad.

## CONCLUSION

Plaintiffs' Motion for Preliminary Injunction proceeds on the erroneous assumptions that SEPTA buses constitute public fora and that Plaintiffs' message is protected speech. Plaintiffs are entitled to neither of these assumptions, without which the array of cases cited in support of

24

their position – which omit the several recent cases in which they were parties – is altogether

inapt. There is no support in the law for the claim that Plaintiffs actually bring to this Court; to

wit, that SEPTA must assist the Plaintiffs in disseminating a message based on a lie and that

demeans a religious faith by agreeing to place the message on public transit vehicles

notwithstanding reasonable advertising regulations that preclude disparaging content.

Respectfully submitted,

Buchanan Ingersoll & Rooney, PC

By:    */s/ Paul C. Madden*
       Paul C. Madden, Esquire
       David A. Schumacher, Esquire
       50 S. 16th Street, Suite 3200
       Philadelphia, PA   19102
       (215) 665-8700

and

Robert S. Hawkins, Esquire
1290 Avenue of the Americas
30th Floor
New York, NY   10104
(212) 440-4486

*Attorneys for The Southeastern Pennsylvania*
*Transportation Authority and Joseph M. Casey*

Date:   October 16, 2014

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on October 16, 2014, true and correct copies of the

foregoing were served, upon the individuals listed below via ECF:

JASON P. GOSSELIN
DRINKER BIDDLE & REATH LLP
ONE LOGAN SQUARE
18th & CHERRY STS.
PHILADELPHIA, PA  19103-6996

BRYNNE MADWAY
DRINKER BIDDLE & REATH LLP
ONE LOGAN SQUARE
18th & CHERRY STS.
PHILADELPHIA, PA  19103-6996

ROBERT JOSEPH MUISE
AMERICAN FREEDOM LAW CENTER
P.O. BOX 131098
ANN ARBOR, MI  48113

DAVID YERUSHALMI
AMERICAN FREEDOM LAW CENTER
1901 PENNSYLVANIA AVE. N.W., SUITE 201
WASHINGTON, DC  20006
*Attorneys for Plaintiff*

/s/ Paul C. Madden
Paul C. Madden