## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| **AMERICAN FREEDOM DEFENSE** | : | **CIVIL ACTION** |
| **INITIATIVE, et al.,** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **No. 2:14-5335** |
| | : | |
| **SOUTHEASTERN PENNYSYLVANIA** | : | |
| **TRANSPORTATION AUTHORITY** | : | |
| **("SEPTA"), et al.,** | : | |
| **Defendants.** | : | |

_____ :

**Goldberg, J.**                                                     **November 25, 2014**

## MEMORANDUM OPINION

The American Freedom Defense Initiative, Pamela Geller, and Robert Spencer (collectively referred to as "Plaintiffs"), claim that The Southeastern Pennsylvania Transportation Authority ("SEPTA") has violated their First Amendment rights by refusing to post an advertisement on buses that SEPTA claims are "patently false" and "offend the minimal civility standards." (Defs.' Opp. to Prelim Inj. p. 1; Defs.' Resp. p. 1.) The advertisement in question states, in relevant part, "Islamic Jew-Hatred: It's in the Quran. Two Thirds of All US Aid Goes to Islamic Countries. Stop the Hate. End All Aid to Islamic Countries." The advertisement also contains a picture of Adolf Hitler meeting with Haj Amin al-Husseini, with the caption, "Adolf Hitler and his staunch ally, the leader of the Muslim world, Haj Amin al-Husseini." (Compl. ¶¶ 20-22.)

This advertising was rejected by SEPTA because it did not comply with advertising standards, particularly Section 9(b)(xi) which prohibits "[a]dvertising that tends to disparage or

1

ridicule any person or group of persons on the basis of race, religious belief, age, sex, alienage, national origin, sickness or disability." (Compl. ¶ 26.) Plaintiffs responded by filing a civil rights action alleging claims under the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983. Plaintiffs also seek a preliminary injunction and request that I immediately order SEPTA to display the advertisement in question.

Currently before me is Plaintiffs' motion to exclude expert testimony regarding the falsity of the advertisement. Because I conclude that falsity of the advertisement's content is not relevant, I will grant Plaintiffs' motion and exclude such testimony from the preliminary injunction hearing.

## I.    Background

During telephone conferences to discuss the parameters of the preliminary injunction hearing, Defendants indicated that they intended to present expert testimony from Dr. Jamal J. Elias, who would establish the falsity of the advertisement in question. In light of the relevancy objections raised by Plaintiffs, I ordered the parties to submit briefing on the admissibility of Dr. Elias' testimony.

Dr. Elias is the Walter H. Annenberg Professor of Humanities at the University of Pennsylvania and a former Guggenheim Fellow. (Defs.' Resp., Exh. A, pp. 20, 27.) Defendants posit that he is "an eminent scholar of Islam and Muslim society." (Defs.' Resp. p. 4.)

Dr. Elias offers two opinions in his report, both of which pertain to alleged inaccuracies in the proposed advertisement. He first concludes that referring to Haj Amin al-Husseini as the "leader of the Muslim word" is "manifestly false." Second, Dr. Elias opines that the statement "the Quar'an teaches Jew-Hatred" is "unfair and erroneous." (Defs.' Resp., Exh. A, pp. 2-3.) Defendants offer these opinions in support of their argument that the advertisement is not

constitutionally protected speech because it contains false factual statements. (Defs.' Opp. to Prelim. Inj. p. 15.)

**II.**      **The Parties' Positions Regarding the Admissibility of Dr. Elias' Testimony**

Plaintiffs urge that Dr. Elias' testimony should be excluded for several reasons. Plaintiffs' primary argument is that falsity is irrelevant as a matter of law because United States v. Alvarez, 132 S. Ct. 2537 (2012) reaffirmed the proposition that "public-issue speech does not lose its First Amendment protection . . . based on a claim of falsity." Plaintiffs also assert that falsity is irrelevant because SEPTA did not reject the advertisement based on its false content. Finally, Plaintiffs argue that the proffered testimony does not satisfy the requirements of Federal Rule of Evidence 702. (Pls.' Mot. pp. 1-2.)

Defendants acknowledge that Alvarez makes clear that laws prohibiting false statements can violate the First Amendment. They respond however that because no law is implicated here what is actually at issue is SEPTA's refusal to accept the advertisement in question. Thus, according to Defendants, falsity remains a relevant consideration because there is no statutory punishment under a law in this case. (Defs.' Resp. pp. 9-10.)

Defendants offer two additional reasons for why the alleged falsity of the advertisement is relevant. First, Defendants point to Illinois v. Telemarketing Associates, Inc., 538 U.S. 600 (2003) which they assert establishes a "fraudulent charitable solicitation" doctrine. In Telemarketing Associates, the United States Supreme Court held that the First Amendment does not bar fraud claims against charities for making false statements in an effort to solicit donations. Defendants assert that the advertisement at issue here is a charitable solicitation and, thus, under Telemarketing Associates, "must be classified as unprotected speech if it is fraudulent." Second, Defendants assert the advertisement's falsity is relevant because it shows that Plaintiffs have

unclean hands and such bad faith should bar the issuance of a preliminary injunction.[1] (Defs.'
Resp. pp. 4-15.)

### III.    <u>Applicable Precedent</u>

Speech concerning public issues "has always rested on the highest rung of the hierarchy
of First Amendment values." <u>N. A. A. C. P. v. Claiborne Hardware Co.</u>, 102 S. Ct. 3409, 3425
(1982). As such, "[i]f there is any fixed star in our constitutional constellation, it is that no
official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or
other matters of opinion." <u>W. Virginia State Bd. of Educ. v. Barnette</u>, 319 U.S. 624, 642 (1943).
Therefore, the protection afforded to political speech does not turn on the truth or popularity of
the sentiments expressed. <u>New York Times Co. v. Sullivan</u>, 84 S. Ct. 710, 721 (1964);
<u>N.A.A.C.P. v. Button</u>, 83 S. Ct. 328, 344 (1963) ("the Constitution protects expression . . .
without regard to . . .  the truth, popularity, or social utility of the ideas and beliefs which are
offered").

Defendants suggest that <u>Alvarez</u> has cast uncertainty on these long enduring principles
regarding First Amendment protection of political speech. In <u>Alvarez</u>, the United States Supreme
Court struck down the Stolen Valor Act which made it a crime to falsely claim receipt of military
decorations or medals. 132 S. Ct. at 2551. A plurality of the Court agreed that the Act violated
the First Amendment but disagreed as to the appropriate level of scrutiny to apply. <u>Id.</u>

Writing for the Court, Justice Kennedy reasoned that, except in rare circumstances,
content-based restrictions are subject to strict scrutiny. <u>Id.</u> at 2543-44 (noting content based
restrictions have only been tolerated in a few categories of expression such as defamation,
speech integral to criminal conduct, "fighting words," and fraud). Justice Kennedy applied strict

---

[1] Defendants also argue that Plaintiffs' motion should be construed as a motion to strike because
it attacks one of Defendants' affirmative defenses.

scrutiny because "false statements," as a general category, did not fall within one of the historically recognized exceptions to the rule against content based speech restrictions. As such, he held that the Stolen Valor Act did not survive strict scrutiny as the blanket criminal prohibition was not the least restrictive means of advancing the government's interest in maintaining the integrity of military honors. Id. at 2548-50. In reaching this conclusion, Justice Kennedy affirmed the principle that falsity alone does not bring speech outside the First Amendment's protection and that the "remedy for speech that is false is speech that is true." Id. at 2544-46, 2550.

In a concurring opinion, Justice Breyer agreed that the false speech criminalized by the Act was entitled to First Amendment protection. Id. at 2551.  Although Justice Breyer would have applied a form of intermediate scrutiny, he nonetheless concluded that the Act would not survive even this less rigorous scrutiny because the government could have achieved its objective in less burdensome ways. Id. at 2555-56.

In a dissenting opinion, Justice Alito indicated that he would have upheld the Act as constitutional. Id. at 2557. Justice Alito reasoned that false statements of fact do not merit First Amendment protection in their own right. Id. at 2563. He, however, noted that it is necessary in some circumstances to provide a degree of "instrumental protection" to false statements in order to ensure that protected speech is given sufficient breathing space. Id. at 2562-63. Justice Alito concluded that the Stolen Valor Act did not present such a circumstance. He reasoned that the Act posed no risk that protected speech would be suppressed because the speech prohibited by the Act is "entirely lacking in intrinsic value, but it also fails to serve any instrumental purpose that the First Amendment might protect." Id. at 2564. In reaching this conclusion and of particular importance to the case before me, Justice Alito stated that laws restricting false

5

statements about issues of public concern, including religion and history, would present "a grave and unacceptable danger of suppressing truthful speech." Id. As such, Justice Alito stressed that "[t]he point is not that there is no such thing as truth or falsity in these areas . . . but rather that it is perilous to permit the state to be the arbiter of truth." Id. at 2564.

## IV.   **Discussion**

Long standing Supreme Court precedent instructs that political speech does not lose First Amendment protection simply because the listener believes that it is false or disagrees with the message it advances. Allowing the state to restrict political speech based on an assessment that it is false or inaccurate, offends bedrock First Amendment principles.[2] See New York Times Co. v. Sullivan, 84 S. Ct. at 721; N.A.A.C.P. v. Button, 83 S. Ct. 328 at; Barnette, 319 U.S. at 642.

Alvarez does not alter these principles. As noted above, a plurality of the Court in Alvarez found that the false speech criminalized by the Stolen Valor Act was protected by the First Amendment. Thus, Alvarez diminishes, rather than advances, Defendants' position.   In reaching this conclusion, the plurality agreed that falsity alone does not bring speech outside of the First Amendment's protection.

Moreover, unlike the speech criminalized by the Stolen Valor Act, the advertisement at issue here is exactly the sort of political expression that lies at the heart of the First Amendment. For example, the advertisement's statement "Islamic Jew-Hatred: It's in the Quran. Two Thirds of All US Aid Goes to Islamic Countries," constitutes political expression and reflects Plaintiffs'

---

[2] Defendants assert that because SEPTA "made no law prohibiting speech of any sort" that Plaintiffs' speech is not chilled. (Defs.' Resp. p. 9). This argument is unavailing because state actions capable of violating the First Amendment are not confined to legislative prohibitions. SEPTA is a state actor. Ford v. Se. Pennsylvania Transp. Auth., 374 F. App'x 325, 326 (3d Cir. 2010).

interpretation of a religious text. This speech is thus entitled to even greater First Amendment protection than the speech at issue in Alvarez.

Indeed, the speech in question is protected under the reasoning embraced by each of the three opinions in Alvarez. Justice Kennedy and Breyer both reaffirmed that falsity alone does not strip speech of First Amendment protections.  Even under the reasoning of Justice Alito's dissenting opinion, Plaintiff's political speech is protected, regardless of its alleged falsity as Justice Alito clearly indicated that the government may not be the arbiter of truth in matters of public concern such as religion and history.

In light of the precedent discussed above, I find that First Amendment principles apply to the advertisement at issue regardless of its alleged falsity.  Consequently, Dr. Elias' conclusions regarding the advertisement's veracity are not relevant and will be excluded from the preliminary injunction hearing.

Defendants also argue that the advertisement is a charitable solicitation and, therefore, is unprotected speech under Illinois v. Telemarketing Associates, Inc., 538 U.S. 600 (2003), if shown to be fraudulent. In Telemarketing Associates, the Supreme Court held that the First Amendment is not violated when states allow fraud actions against charitable organizations that make "false or misleading representations designed to deceive donors about how their donations will be used." Id. at 624.

Defendants note that the advertisement lists a website address which redirects to another website and that this second website "actively seeks donations from visitors." (Defs.' Resp. p. 11.)  Thus, Defendants assert that Telemarketing Associates applies because the advertisement in question contains false representations designed to deceive donors.  This argument is too attenuated. The advertisement is not fairly characterized as a solicitation simply because it

contains a link which redirects traffic to a second webpage which in turn allows visitors to make donations.  As such, the advertisement is not stripped of First Amendment protection on the grounds of the fraudulent charitable solicitation doctrine.[3]

Lastly, Defendants urge that Plaintiffs' submission of a false advertisement and refusal to alter the advertisement in response to SEPTA's request to do so invokes the doctrine of unclean hands. I disagree.

"A successful unclean hands defense to an injunction proceeding requires a showing by defendant that plaintiff's conduct is inequitable and that it involves the subject matter of the plaintiff's claim." Ciba-Geigy Corp. v. Bolar Pharm. Co., 747 F.2d 844, 855 (3d Cir. 1984). In order for the doctrine to bar a claim, the party seeking equitable relief must be "guilty of conduct involving fraud, deceit, unconscionability, or bad faith." Imprisoned Citizens Union v. Shapp, 11 F. Supp. 2d 586, 608 (E.D. Pa. 1998).

Defendants point to the fact that Plaintiffs declined to alter the advertisement at SEPTA's behest because Plaintiffs believed doing so would "rob the Ad of its effectiveness." Defendants state that this "strident stance" reveals a "reckless intention" and demonstrates Plaintiffs' unclean

---

[3] Defendants also assert that Plaintiffs' motion must be construed as a motion to strike under Federal Rule of Civil Procedure 12(f) because the motion "necessarily encompasses a request for relief under Fed. R. Civ. P. 12(f) to strike" Defendants' affirmative defense that the advertisement is not constitutionally-protected speech because it uses "deliberate and reckless falsehoods."  (Defs.' Resp. p. 3.)

Federal Rule of Civil Procedure 12(f) provides that the "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).

Plaintiffs' motion to exclude properly raises the issue of the relevance of Dr. Elias' opinions at the preliminary injunction hearing. Although the rules of evidence are relaxed at preliminary injunction hearings, Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 718 (3d Cir. 2004), determining the relevancy of the advertisement's falsity at this juncture is necessary because the issue is central to resolution of whether Plaintiffs can establish by a preponderance of the evidence that a preliminary injunction is warranted.

hands. (Defs.' Resp. pp. 12-14.) Defendants' unclean hands argument is essentially a repackaging of the claim that Plaintiffs' speech is unprotected because it is false.  Plaintiffs' advertisement implicates First Amendment principles regardless of its falsity.  As such, their desire to have the advertisement run as submitted is not the sort of bad faith or unconscionable conduct that the doctrine of unclean hands penalizes.

**V.**    **<u>Conclusion</u>**

For the reasons expressed herein, the expert report and testimony of Dr. Elias will be excluded from the hearing on the motion for a preliminary injunction.

An appropriate order follows.