**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
|   |
**AMERICAN FREEDOM DEFENSE**      :     **CIVIL ACTION**
**INITIATIVE ("AFDI"), et al.,**      :
         **Plaintiffs,**      :
     :
     **v.**      :     **No. 2:14-cv-5335**
     :
**SOUTHEASTERN PENNSYLVANIA**      :
**TRANSPORTATION AUTHORITY**      :
**("SEPTA"), et al.,**      :
         **Defendants.**      :
_____ :

**Goldberg, J.**                                          **March 11, 2015**

## <u>MEMORANDUM OPINION</u>

The American Freedom Defense Initiative ("AFDI") claims that the Southeastern Pennsylvania Transportation Authority ("SEPTA") has violated its First Amendment rights by refusing to post an advertisement on buses that SEPTA asserts is "patently false" and offends "minimal civility standards." Currently before me is Plaintiffs' motion for a preliminary injunction.[1] Because I find that SEPTA's refusal violates the First Amendment and that Plaintiffs have satisfied all elements necessary to obtain an injunction, I will grant Plaintiffs' motion.

## I.     <u>FACTUAL AND PROCEDURAL HISTORY</u>[2]

Plaintiff AFDI is a nonprofit organization "dedicated to freedom of speech, freedom of conscience, freedom of religion and individual rights." It pursues these objectives, in part, by purchasing advertising space on transit authority property around the country.

---

[1] Individual Plaintiffs, Pamela Geller and Robert Spencer, have also sought injunctive relief.

[2] Unless otherwise noted, these facts are taken from the parties' joint "Stipulated Facts for Purposes of Plaintiffs' Motion for Preliminary Injunction." (Doc. No. 34.)

Titan Outdoor LLC ("Titan") is an advertising company that solicits and displays advertising on behalf of transit authorities. In 2005, Titan entered into a contract with SEPTA to solicit and display advertising on SEPTA stations, vehicles and products. The contract contains thirteen advertising standards which prohibit certain categories of advertising from display on SEPTA property. The standard at issue, section 9(b)(xi) ("the anti-disparagement standard"), prohibits:

> Advertising that tends to disparage or ridicule any person or group of persons on the basis of race, religious belief, age, sex, alienage, national origin, sickness or disability.

In connection with the SEPTA contract, Titan's solicitation program focuses on commercial and non-profit institutions. Titan does not solicit "public issue" advertisements. However, it is undisputed that from January 1, 2011 to December 1, 2014, 41 of the 5,318 advertisements SEPTA ran involved public issues. (Defs.' Br. p. 6.) These "public issue" advertisements covered a diverse range of topics including animal cruelty, teacher seniority, birth control, religion, fracking and sexual harassment.

On May 27, 2014, Plaintiffs submitted the advertisement in question to Titan with a request that it be displayed on SEPTA buses. The advertisement states, in relevant part, "Islamic Jew-Hatred: It's in the Quran. Two Thirds of All US Aid Goes to Islamic Countries. Stop the Hate. End All Aid to Islamic Countries." The advertisement also contains a picture of Adolf Hitler meeting with Haj Amin al-Husseini,[3] with the caption, "Adolf Hitler and his staunch ally, the leader of the Muslim world, Haj Amin al-Husseini." The advertisement appears as follows:

---

[3] According to Plaintiffs, Haj Amin Al-Husseini was "the leader of the entire pan-Arab movement and later the undisputed leader of the Palestinian national movement." (Mot. to Exclude p. 9.) SEPTA disagrees with this characterization and asserts that "for a period of time Mr. Al-Husseini held titles and offices given to him by the British Empire [ ]. To call him 'the leader of the Muslim world' is manifestly false." (Defs.' Resp. to Mot. to Exclude p. 4.)



After receiving the advertisement, Titan contacted SEPTA's advertising department raising concerns that the advertisement violated SEPTA's advertising standards. Uncertain as to how to proceed, SEPTA's advertising department notified SEPTA's general counsel's office. Following a meeting with other members of the general counsel's office, Gino J. Benedetti, General Counsel for SEPTA and SEPTA's final decision maker, rejected the advertisement. (Tr. 25-26, 28-30.)

On June 3, 2014, Titan notified Plaintiffs that SEPTA had rejected the advertisement on the basis that it did not comply with "the anti-disparagement standard." Plaintiffs then filed this civil rights action alleging claims under the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983. Plaintiffs also filed a motion for a preliminary injunction requesting that I immediately enjoin enforcement of the anti-disparagement standard and order SEPTA to display the advertisement in question.

At a subsequent pre-hearing conference, SEPTA advised that they intended to present expert testimony from Dr. Jamal J. Elias, Walter H. Annenberg Professor of Humanities at the University of Pennsylvania to offer two opinions, both of which pertain to alleged factual inaccuracies in the advertisement. SEPTA argued that Dr. Elias' opinions were relevant to show that the advertisement contains false factual statements that are not entitled to First Amendment

protection. Plaintiffs countered that Dr. Elias' testimony should be excluded because public issue speech does not lose its First Amendment protection based on a claim of falsity. In light of long standing United States Supreme Court precedent, I held that First Amendment principles apply to the advertisement in question regardless of its alleged falsity and excluded Dr. Elias' conclusions from the preliminary injunction hearing. See Am. Freedom Def. Initiative v. SEPTA, 2014 WL 6676517 (E.D. Pa. Nov. 25, 2014).

A hearing on the preliminary injunction was held on December 17, 2014. There, Mr. Benedetti generally described SEPTA's advertising practices as well as the particular process that led to the rejection of Plaintiffs' advertisement. SEPTA's written policy states that "[a]ll advertising shall be submitted to SEPTA for review and approval prior to display." However, Mr. Benedetti testified that SEPTA does not follow this policy. (Tr. 24) ("That's what this says, but that was not what was done in practice.") Mr. Benedetti further testified there are no written procedures for when Titan believes that an advertisement may violate the standards or for how SEPTA then resolves those concerns.

According to Mr. Benedetti, in practice, Titan alerts SEPTA's advertising department and if that department is unsure of what to do with the advertisement, the general counsel's office is contacted. Mr. Benedetti stated that the general counsel's office then reviews the advertisement and makes a determination regarding its compliance with the advertising standards. Mr. Benedetti testified that there are no written procedures for appealing such a determination. (Tr. 20-37.)

Mr. Benedetti explained that he rejected the advertisement because he believed that the "ad disparaged Muslims because it portrayed them in a way that I believe was untrue and incorrect and false" and "put every single Muslim in the same category being a Jew hater, and it

4

informed the reader that Hosh Amin al-Hussein [sic] is the leader of the Muslim world." Mr.
Benedetti acknowledged that SEPTA does not have any written guidelines defining the words
"disparage" or "demean" as used in the anti-disparagement standard. (Tr. 39-47.)

## II.   LEGAL STANDARD – PRELIMINARY INJUNCTION

A preliminary injunction is an extraordinary remedy. <u>Instant Air Freight Co. v. C.F. Air</u>
<u>Freight, Inc.</u>, 882 F.2d 797, 800 (3d Cir. 1989). As such, the granting of preliminary injunctive
relief is restricted to limited circumstances. <u>Id.</u> In order to obtain a preliminary injunction, a
plaintiff must establish four elements:

> (1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2)
> the extent to which the plaintiff is being irreparably harmed by the conduct
> complained of; (3) the extent to which the defendant will suffer irreparable harm
> if the preliminary injunction is issued; and (4) the public interest.

<u>A.T.&T. Co. v. Winback & Conserve Program, Inc.</u>, 42 F.3d 1421, 1427 (3d Cir. 1994).   A
preliminary injunction "should issue only if the plaintiff produces evidence sufficient to convince
the district court that all four factors favor preliminary relief." <u>Id.</u> Additionally, "when the
preliminary injunction is directed not merely at preserving the status quo but . . . at providing
mandatory relief, the burden on the moving party is particularly heavy." <u>Punnett v. Carter</u>, 621
F.2d 578, 582 (3d Cir. 1980).

## III.   LEGAL ANALYSIS

Plaintiffs argue that SEPTA's anti-disparagement standard is unconstitutional and the
rejection of their advertisement for non-compliance with that standard violated their First
Amendment free speech rights. Plaintiffs' request for injunctive relief must therefore be analyzed
under relevant First Amendment precedent.

### A.  Likelihood of Success on the Merits

The United States Court of Appeals for the Third Circuit precedent instructs that in order to demonstrate a likelihood of success on the merits "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a Prima [sic] facie case showing a reasonable probability that it will prevail on the merits." Oburn v. Shapp, 521 F.2d 142, 148 (3d Cir. 1975).

The Supreme Court has outlined a three-step analysis regarding a prima facie case of alleged First Amendment violations. See Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788, 797 (1985). The first step is to determine whether the advertisement in question constitutes speech protected by the First Amendment. Thereafter, the nature of the forum created by SEPTA's advertising space must be determined because the appropriate level of scrutiny depends on the categorization of the forum. Lastly, an examination of whether the anti-disparagement standard at issue survives the applicable level of scrutiny must be undertaken.

The proposition that the First Amendment strongly protects the right to express opinions on public questions has "long been settled" by Supreme Court precedent. New York Times Co. v. Sullivan, 376 U.S. 254, 269 (1964). This enduring proposition reflects the belief "that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection." Id. at 270 (quoting United States v. Associated Press, 52 F. Supp. 362, 372 (S.D.N.Y. 1943)). Therefore, Plaintiffs' claims must be analyzed "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." New York Times Co., 376 U.S. at 270.

### i.   Protected Speech

The advertisement contains statements about foreign aid and references to the Quran. This content squarely involves political expression and reflects Plaintiffs' interpretation of a religious text, both of which are protected speech. This type of public issue expression lies at the very heart of the First Amendment's protections. Indeed, speech concerning public issues "has always rested on the highest rung of the hierarchy of First Amendment values." NAACP v. Claiborne Hardware Co., 458 U.S. 886, 913 (1982).

### ii.   Forum Analysis

Having concluded that the advertisement falls within the scope of the First Amendment's protection, I will next assess the nature of the forum created by SEPTA's advertising space.

The First Amendment guarantees freedom of expression against infringement by the state, not by private actors. Hurley v. Irish-American Gay Group of Boston, 515 U.S. 557 (1995). It is undisputed that SEPTA is a state actor. Ford v. SEPTA, 374 F. App'x 325, 326 (3d Cir. 2010).

The government is not required to "grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." Cornelius, 473 U.S. at 799-800. As such, the Supreme Court has developed a "forum analysis" to determine whether the governmental interest in limiting use of certain public property outweighs the interest of those wishing to use the property for expressive activity. Id. at 800. When the government limits speech by restricting access to its own property, the level of scrutiny applied depends on how the property is categorized. The Supreme Court's forum analysis doctrine recognizes three types of fora – the traditional public forum, the designated public forum and the non-public forum.

7

Christian Legal Soc. Chapter of the Univ. of California v. Martinez, 561 U.S. 661, 679 n.11 (2010).

The traditional public forum includes spaces which "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Hague v. Comm. for Indus. Org., 307 U.S. 496, 515 (1939). Streets and parks are "archetypal" examples of public fora. Christ's Bride Ministries, Inc. v. SEPTA, 148 F.3d 242, 248 (3d Cir. 1998). In the traditional public forum, content-based speech restrictions are subject to strict scrutiny and only pass constitutional muster if they are necessary to achieve a compelling government interest. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983). On the other hand, content-neutral restrictions which merely regulate the time, place, and manner of expression in a public forum are permissible if "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." Id.

A designated public forum is public property "'that has not traditionally been regarded as a public forum' but that the government has intentionally opened up for use by the public as a place for expressive activity." Pittsburgh League of Young Voters Educ. Fund v. Port Auth., 653 F.3d 290, 296 (3d Cir. 2011) (quoting Pleasant Grove City v. Summum, 555 U.S. 460 (2009)). Like the traditional public forum, content-based speech restrictions in a designated public forum are subject to strict scrutiny. Pittsburgh League of Young Voters Educ. Fund, 653 F.3d at 296.

Finally, public property that "is not by tradition or designation a forum for public communication" constitutes a non-public forum. Perry Educ. Ass'n, 460 U.S. at 46. Restrictions on speech in a non-public forum are permissible so long as they are reasonable and viewpoint neutral. Id.

Importantly, regardless of the forum's classification, viewpoint based restrictions are unconstitutional. Pittsburgh League of Young Voters Educ., 653 F.3d at 296 ("Viewpoint discrimination is anathema to free expression and is impermissible in both public and non-public fora.") A viewpoint restriction "targets not subject matter, but particular views taken by speakers on a subject." Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995). In other words, if the government allows speech on a certain subject in any forum, it must accept all viewpoints on the subject, even those that it disfavors or finds unpopular. Pittsburgh League of Young Voters Educ., 653 F.3d at 296

In conducting the forum analysis, courts "look to the authority's intent with regard to the forum in question and ask whether [the authority] clearly and deliberately opened its advertising space to the public." Christ's Bride Ministries, 148 F.3d at 248-49. "The authority's own statement of its intent, however, does not resolve the public forum question." Id. at 251. Rather, intent is gauged by examining the authority's "policies and practices in using the space and also the nature of the property and its compatibility with expressive activity." Id. at 249. Restrictions on the use of the forum "do not necessarily mean that [the authority] has not created a public forum. They may demonstrate instead that [the authority] intended to create a limited public forum, open only to certain kinds of expression." Id.

Plaintiffs argue that SEPTA's advertising space constitutes a designated public forum requiring application of strict scrutiny to the anti-disparagement standard. Although a non-public forum case, Plaintiffs contend that the analysis set forth in Lehman v. City of Shaker Heights, 418 U.S. 298 (1974) is instructive. In Lehman, the Supreme Court held that "card car" space on transit authority vehicles was a non-public forum because the City of Shaker Heights had a policy which prohibited political and public issue advertising and had consistently enforced that

ban for twenty-six years. Id. at 300-304. Plaintiffs assert that Lehman stands for the proposition that a consistently enforced ban on political and public issue advertising demonstrates a transportation authority's intent to maintain its advertising space as a non-public forum. Plaintiffs note that other courts have adopted this reading of Lehman when analyzing whether a particular transportation authority's advertising space is a public or non-public forum.

Relying on Lehman, Plaintiffs note that in contrast, SEPTA's advertising practices do not restrict advertisements to only commercial speech. Plaintiffs urge that SEPTA's acceptance of a wide range of controversial public issue advertisements indicates a willingness to open up its property to expressive conduct, and thus the advertising space in question is a designated public forum.

In further support, Plaintiffs cite to Christ's Bride Ministries where the Third Circuit previously held that SEPTA's advertising space was a designated public forum. There, the Third Circuit concluded:

> [B]ased on SEPTA's written policies, which specifically provide for the exclusion of only a very narrow category of ads, based on SEPTA's goals of generating revenues through the sale of ad space, and based on SEPTA's practice of permitting virtually unlimited access to the forum, that SEPTA created a designated public forum. Moreover, it created a forum that is suitable for the speech in question.

Christ's Bride Ministries, 148 F.3d at 252 (1998). Plaintiffs contend that not much has changed since Christ's Bride Ministries was decided as SEPTA's current policies and practices demonstrate that the forum remains open to and suitable for speech concerning public issues.

SEPTA counters that its advertising space constitutes a non-public forum because it has maintained "tight control" over the kinds of advertisements that have appeared on its buses since 2005. SEPTA points to Mr. Benedetti's testimony that it was never SEPTA's intention to create a public forum. According to SEPTA, the advertising standards are consistent with this intention

as they contain "detailed substantive and procedural limitations" on the public's access to the forum. SEPTA notes that pursuant to these limitations, Titan does not solicit public issue advertisements and, as a result, less than one percent of all advertisements run on SEPTA buses over the past four years involved issues of public concern.

SEPTA also argues that Plaintiffs' reliance on Christ's Bride Ministries is misplaced because that case involved SEPTA's practices as they existed sixteen years ago. In particular, SEPTA notes that at the time Christ's Bride Ministries was decided it only had a limited number of advertising restrictions and maintained a program that affirmatively encouraged advertisements on matters of public concern. According to SEPTA, its current policies, which do not affirmatively encourage advertisements on matters of public concern and require adherence to a more detailed set of standards, dictate a different result.

SEPTA further asserts that its current policies and practices are akin to those of the King County Department of Transportation which were considered in Am. Freedom Def. Initiative v. King County, No. 13-1804, 2014 WL 345245, at *1 (W.D. Wash. Jan. 30, 2014). According to SEPTA, King County employs advertising standards and practices similar to SEPTA's standards and practices. SEPTA notes that the court concluded that King County's policies and practices evidenced an intention to create a limited forum (i.e. non-public forum)[4] and that this conclusion compels a finding that SEPTA's advertising space is a non-public forum.[5]

---

[4] The United States Court of Appeals for the Ninth Circuit uses the term "limited public forum" to "refer to a type of nonpublic forum that the government has intentionally opened to certain groups or to certain topics." Hopper v. City of Pasco, 241 F.3d 1067, 1074 (9th Cir. 2001). According to the Ninth Circuit, "in a limited public forum, restrictions that are viewpoint neutral and reasonable in light of the purpose served by the forum are permissible." Id. at 1074-75. As such, the Ninth Circuit applies the same level of scrutiny to restrictions in its "limited public forum" that the Third Circuit applies to restrictions in a "non-public forum."

[5] Contrary to SEPTA's assertion, King County does not support the argument that its advertising space is a non-public forum. Pursuant to its policy, King County does not accept advertisements

For the following reasons, and after considering the evidence presented at the preliminary injunction hearing, I find that SEPTA's advertising space constitutes a designated public forum.

First, as a threshold matter, the testimony of Mr. Benedetti that SEPTA intended to create a non-public forum is not dispositive of the forum analysis inquiry. See Christ's Bride Ministries, 148 F.3d at 251. The focus of my inquiry remains on the evidence of SEPTA's actual policies and practices.

Second, SEPTA does not have an official policy which prohibits political or public issue advertising from appearing on its property. None of SEPTA's advertising standards limit the range of acceptable advertisements to those which contain only commercial or uncontroversial speech. Nor is SEPTA's practice limited to only accepting commercial advertisements. Importantly, over the past four years, SEPTA has accepted a number of concededly public issue advertisements on such topics as teacher seniority, fracking and contraceptive use. (Stipulated Facts, Ex. 1-1-A.)

Third, Lehman and subsequent cases applying its teachings make clear that SEPTA's acceptance of political and public issue speech demonstrates a general intent to open the forum for expression. See Lehman, 418 U.S. at 300-04; DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ., 196 F.3d 958, 966 (9th Cir. 1999) ("where the government historically has accepted a wide variety of advertising on commercial and non-commercial subjects, courts have found that advertising programs on public property were public fora"); Lebron v. Washington Metropolitan Area Transit Auth. ("WMATA"), 749 F.2d 893, 896 (D.C. Cir. 1984) ("There is no doubt . . . that WMATA has converted its subway stations into public fora by accepting . . . political

that would create substantial controversy or that contain political campaign speech. King County, 2014 WL 345245, at *4. The policies and practices at issue in King County are markedly different from SEPTA's policies and practices in several material respects. Most importantly, SEPTA's standards do not prohibit all political campaigns or controversial speech.

advertising"); <u>Planned Parenthood Ass'n v. Chicago Transit Auth.</u>, 767 F.2d 1225, 1232 (7th Cir. 1985) (finding transit authority advertising space to be a public forum because the space had been "used for a wide variety of commercial, public-service, public-issue, and political ads"); <u>New York Magazine v. Metro. Transp. Auth.</u>, 136 F.3d 123, 130 (2d Cir. 1998) ("The district court thus correctly found that the advertising space on the outside of MTA buses is a designated public forum, because the MTA accepts both political and commercial advertising.") Unlike the blanket political speech prohibition in <u>Lehman</u>, SEPTA's policies and practices indicate that the forum is open to and suitable for public issue speech.

Finally, my conclusion that SEPTA's current practices and policies evidence an intention to open the forum to expressive activity is also consistent with <u>Christ's Bride Ministries</u>. At the time that <u>Christ's Bride Ministries</u> was decided, SEPTA's policies 1) prohibited libelous and obscene advertising, 2) expressed a preference that the agency which managed its advertising space, TDI, "concentrate" on advertising unrelated to tobacco and alcohol products and 3) retained for SEPTA the sole discretion to reject any advertisement that it deemed objectionable. <u>Christ's Bride Ministries</u>, 148 F.3d at 249-51. Under the prior contract before the court in <u>Christ's Bride Ministries</u>, SEPTA also participated in a program called "TDI Cares" in which SEPTA could elect to donate unused advertising space to an "issue of public concern" selected jointly by SEPTA and TDI. <u>Id.</u>[6]

SEPTA accurately notes that its current policies and practices are different than those at issue in <u>Christ's Bride Ministries</u>. SEPTA no longer participates in a program to donate unused advertising space to an "issue of public concern." SEPTA's current policies also prohibit

---

[6] The Third Circuit noted that "[t]here is no evidence on the record of which ads actually ran [pursuant to the TDI Cares program] or of how much advertising space SEPTA and/or TDI actually donated to those campaigns. Considered with the other evidence in the record, the brochure demonstrates, however, that the forum in question is suitable for speech concerning social problems and issues." <u>Christ's Bride Ministries</u>, 148 F.3d at 249 n.4.

additional categories of advertising that were not prohibited under its previous contract. Despite these differences, neither set of policies prohibits political, public issue or controversial advertisements. Thus, although the standards are more numerous than they were at the time Christ's Bride Ministries was decided, SEPTA's current policies and practices demonstrate that the forum in question remains open to and suitable for speech concerning public issues.

### iii. Constitutional Scrutiny

Having determined that SEPTA's advertising space constitutes a designated public forum, I now turn to whether the anti-disparagement standard survives the applicable level of scrutiny. To determine whether speech restrictions in a designated public forum are constitutional, courts apply "the time, place, and manner doctrine." See Brown v. City of Pittsburgh, 586 F.3d 263, 271 (3d Cir. 2009). Under that doctrine, a time, place and manner restriction "is constitutionally permissible if it is narrowly tailored to serve the government's legitimate, content-neutral interests and leaves open ample alternative channels for communication." Id. (citations omitted). However, if restrictions are content-based, the test is "whether they were necessary to serve a compelling government interest, were narrowly drawn to achieve that interest, and were the least restrictive means of achieving that interest." United States v. Marcavage, 609 F.3d 264, 279 (3d Cir. 2010).

Thus, the first issue is whether SEPTA's anti-disparagement standard is content-based. To determine whether a restriction is content-based, courts look at whether it "restrict(s) expression because of its message, its ideas, its subject matter, or its content." Consol. Edison Co. of N.Y. v. Pub. Serv. Comm. of N.Y., 447 U.S. 530, 537 (1980). In R.A.V. v. City of St. Paul, 505 U.S. 377 (1992), the Supreme Court considered whether the following municipal ordinance was content-based:

> Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.

Id. at 380.

Minnesota state courts interpreting this ordinance had narrowly construed the ordinance to apply only to fighting words. Id. at 381. Although fighting words are generally excluded from the scope of First Amendment protection, the Supreme Court, nonetheless, held that the ordinance ran afoul of the First Amendment as a content-based restriction. Id. at 387, 391. The Court reasoned that:

> Displays containing abusive invective, no matter how vicious or severe, are permissible unless they are addressed to one of the specified disfavored topics. Those who wish to use 'fighting words' in connection with other ideas—to express hostility, for example, on the basis of political affiliation, union membership, or homosexuality—are not covered.

Id. at 391. The Court concluded that the ordinance was an unconstitutional content-based restriction because "[t]he First Amendment does not permit St. Paul to impose special prohibitions on those speakers who express views on disfavored subjects." Id.

In light of the Supreme Court's holding in R.A.V., I find that SEPTA's anti-disparagement standard is a content-based restriction. Like the ordinance in R.A.V., the anti-disparagement standard permits disparaging advertisements so long as they are not addressed to one of the disfavored topics which are specifically enumerated. In fact, outside of these specified topics, SEPTA's standards could permit advertisements which disparage, for example, political affiliation or union membership. Thus, in selectively prohibiting speech based upon the subject addressed, SEPTA's anti-disparagement standard constitutes a content-based restriction.

Such content-based regulations are presumptively invalid in traditional and designated public forums. Id. at 382. As such, in these forums, content-based restrictions only survive constitutional scrutiny if they are actually necessary to serve a compelling state interest. Marcavage, 609 F.3d at 279.

SEPTA has not argued that the anti-disparagement standard survives strict scrutiny. However, even if SEPTA had claimed a compelling state interest in shielding the specifically identified groups from abuse, the restriction would still likely fail as not actually necessary to achieve that interest. This conclusion finds support in R.A.V., where the Supreme Court concluded the "fighting words" ordinance was not necessary to achieve the government's stated interest in "ensuring the basic human rights of members of groups that have historically been subjected to discrimination." 505 U.S. at 395. The Court reasoned that "[a]n ordinance not limited to the favored topics, for example, would have precisely the same beneficial effect. In fact the only interest distinctively served by the content limitation is that of displaying the city council's special hostility towards the particular biases thus singled out. That is precisely what the First Amendment forbids." Id. at 396.

Like the fighting words ordinance in R.A.V., SEPTA's anti-disparagement standard would have the same "beneficial effect" even if its prohibition was not limited to the specific enumerated groups. Therefore, the anti-disparagement standard's content-based restriction is not actually necessary to achieve whatever compelling state interest SEPTA may claim as justification. As such, the anti-disparagement standard does not survive strict scrutiny and Plaintiffs are likely to succeed on the merits of their First Amendment claim.

Plaintiffs are also correct in asserting that the anti-disparagement standard goes beyond content discrimination to actual viewpoint discrimination. Plaintiffs argue that this conclusion is compelled by R.A.V., which states:

> Displays containing some words—odious racial epithets, for example—would be prohibited to proponents of all views. But "fighting words" that do not themselves invoke race, color, creed, religion, or gender—aspersions upon a person's mother, for example—would seemingly be usable ad libitum in the placards of those arguing in favor of racial, color, etc., tolerance and equality, but could not be used by those speakers' opponents. One could hold up a sign saying, for example, that all "anti-Catholic bigots" are misbegotten; but not that all "papists" are, for that would insult and provoke violence "on the basis of religion." St. Paul has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules.

505 U.S. at 391-92. Relying on this reasoning, Plaintiffs note that had their advertisement stated "Islamic love of Jews . . . It's in the Quran," it would not have been rejected for violating the anti-disparagement standard. Plaintiffs contend that the anti-disparagement standard, therefore, constitutes viewpoint discrimination.

SEPTA counters that the anti-disparagement standard "is viewpoint neutral inasmuch as it applies regardless of point of view." In support of their position, SEPTA contends that the standard does not suppress expression on one side of the debate because "neither side could flaunt the standard."

In light of R.A.V., I agree with Plaintiffs that the anti-disparagement standard is viewpoint based and, therefore, impermissible regardless of the forum categorization. The plain language of the restriction only prohibits expression which disparages certain groups. Under the anti-disparagement standard, speech which praises those same groups is clearly permissible. Therefore, the restriction is viewpoint based and unconstitutional regardless of the nature of the forum. See Pittsburgh League of Young Voters Educ. Fund, 653 F.3d at 296 ("Regardless of

whether the advertising space is a public or nonpublic forum, the coalition is entitled to relief because it has established viewpoint discrimination.")

### B.  Irreparable Harm to Plaintiffs

The second prong of the preliminary injunction standard requires that I next consider the extent to which Plaintiffs will suffer irreparable harm absent the requested relief. See Clean Ocean Action v. York, 57 F.3d 328, 331 (3d Cir. 1995). Plaintiffs assert that it is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976).

SEPTA counters that the Third Circuit has "retreated from the automatic presumption of irreparable harm" established in Elrod. In support of this position, SEPTA relies on the non-precedential opinion in Conchatta, Inc. v. Evanko, 83 F. App'x 437 (3d Cir. 2003), which states, "[w]hile other circuits relax the irreparable harm requirement in First Amendment cases, our Court requires a First Amendment plaintiff seeking a preliminary injunction to prove irreparable harm." Id. at 442 n.3. SEPTA further notes that the Third Circuit indicated that "[t]he statement in Elrod that 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury' addresses the requisite *duration* of a deprivation of First Amendment rights, but does not suggest that a real or threatened deprivation need not occur." Id. (emphasis in original).

SEPTA correctly notes that Conchatta held that the plaintiffs in that case had not demonstrated irreparable harm. However, Conchatta involved a pre-enforcement facial challenge to a statute prohibiting "lewd, immoral, or improper entertainment" in facilities holding liquor licenses. Id. at 438-39, 442-43. The Third Circuit agreed with the district court that the plaintiffs had not met their burden of demonstrating irreparable harm because "[s]o far as the record

discloses, the plaintiffs have never been cited for violating the statute or regulations, and there is no imminent threat of such action." Id. at 443. This fact specific holding does not mark a retreat from the automatic presumption principle enounced in Elrod and the Third Circuit has since reaffirmed the principle's continued validity. See B.H. ex rel. Hawk v. Easton Area Sch. Dist., 725 F.3d 293, 323 (3d Cir. 2013) (holding that pursuant to Elrod a restriction which prevents the exercise of the right to freedom of speech "unquestionably constitutes irreparable injury.")

Plaintiffs have alleged a real and actual deprivation of their First Amendment rights. Therefore, I find that Plaintiffs have adequately demonstrated irreparable harm because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod, 427 U.S. at 373.

### C.  Irreparable Harm to Defendants

The third prong of the preliminary injunction standard requires me to consider "whether granting preliminary relief will result in even greater harm to the nonmoving party." Allegheny Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999).

Plaintiffs assert that no legitimate interest claimed by SEPTA can be harmed by the exercise of their constitutionally protected rights. Plaintiffs also note that the advertisement in question has run on transit authority advertising space in other major cities without incident. SEPTA counters they will suffer irreparable harm if the preliminary injunction is granted because running the advertisement will result in decreased ridership and adversely affect SEPTA's relationship with its Muslim employees.

Although SEPTA's concerns are not immaterial, it cannot properly claim a legitimate interest in enforcing an unconstitutional law. See ACLU v. Ashcroft, 322 F.3d 240, 251 n.11 (3d Cir. 2003) ("Neither the Government nor the public generally can claim an interest in the

enforcement of an unconstitutional law.") Therefore, I find that the interest in vindicating First Amendment freedoms outweighs any harm that may befall SEPTA in granting the preliminary injunction.

### D.  Public Interest

The fourth prong requires me to assess whether granting injunctive relief is in the public interest. Winback & Conserve Program, 42 F.3d at 1427 n.8. The Third Circuit has recognized that "[a]s a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." Id.

Additionally, many courts have held that there is a significant public interest in upholding First Amendment principles. See Ramsey v. City of Pittsburgh, 764 F. Supp. 2d 728, 735 (W.D. Pa. 2011) (citing Homans v. Albuquerque, 264 F.3d 1240, 1244 (10th Cir. 2001) ("We believe that the public interest is better served by following binding Supreme Court precedent and protecting the core First Amendment right of political expression"); Iowa Right to Life Comm'e, Inc. v. Williams, 187 F.3d 963, 970 (8th Cir. 1999) ("the potential harm to independent expression and certainty in public discussion of issues is great and the public interest favors protecting core First Amendment freedoms"); Elam Constr., Inc. v. Regional Transp. Dist., 129 F.3d 1343, 1347 (10th Cir. 1997) ("the public interest [ ] favors plaintiffs' assertion of their First Amendment rights"); G & V Lounge, Inc. v. Mich. Liquor Control Com'n, 23 F.3d 1071, 1079 (6th Cir. 1994) ("it is always in the public interest to prevent the violation of a party's constitutional rights"); Cate v. Oldham, 707 F.2d 1176, 1190 (11th Cir. 1983) (noting the "strong public interest in protecting First Amendment values"). As such, I find that granting the requested injunctive relief is in the public interest.

IV.   **BOND REQUIREMENT**

Federal Rule of Civil Procedure 65(c) states that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

Although "the amount of the bond is left to the discretion of the court, the posting requirement is much less discretionary." Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 103 (3d Cir. 1988) ("While there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory.") In other words, Rule 65(c) "mandates that a court when issuing an injunction must require the successful applicant to post adequate security." Id.

Neither party has addressed the bond requirement. However, Plaintiffs seek injunctive relief to protect their First Amendment rights. SEPTA did not offer any evidence that they will suffer a financial loss as a result of the injunction. Therefore, I will require Plaintiffs to post a nominal bond of $100 before the preliminary injunction will issue.

V.   **CONCLUSION**

I conclude that SEPTA's anti-disparagement standard violates the First Amendment. I reach this conclusion because I am compelled to do so under established First Amendment precedent. That said, based on the evidence presented at the preliminary injunction hearing, it is clear that the anti-disparagement standard promulgated by SEPTA was a principled attempt to limit hurtful, disparaging advertisements. While certainly laudable, such aspirations do not, unfortunately, cure First Amendment violations.

For the reasons expressed herein, Plaintiffs' motion for a preliminary injunction is granted. An appropriate Order follows.